118 F.3d 298
 UNITED STATES of America, Plaintiff-Appellee,
v.
JUVENILE NO. 1; Juvenile No. 3; Juvenile No. 4,
Defendants-Appellants.
 No. 96-40575.
 United States Court of Appeals,
Fifth Circuit.
 July 17, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Sept. 9, 1997.
 
 Heather Harris Rattan, Sherman, TX, for Plaintiff-Appellee.
 G. Patrick Black, Amy R. Blalock, Federal Public Defender's Office, Tyler, TX, for Juvenile No. 1, Defendant-Appellant.
 William Stephen Loveless, Denton, TX, for Juvenile No. 3, Defendant-Appellant.
 Teresa Gayle Sanchez, Boyd and Veigel, McKinney, TX, for Juvenile No. 4, Defendant-Appellant.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before POLITZ, Chief Judge, KING, Circuit Judge, and FOLSOM,* District Judge.
 KING, Circuit Judge:
 
 
 1
 This case presents an issue of first impression in this circuit concerning the prosecution of juveniles in federal court: whether the Attorney General's certification under the Juvenile Justice and Delinquency Prevention Act of 1974, 18 U.S.C. §§ 5031-5042, that there exists a "substantial Federal interest" to warrant the exercise of federal jurisdiction in a juvenile prosecution is subject to judicial review. In holding that the Attorney General's certification of a "substantial Federal interest" under 18 U.S.C. § 5032 is not subject to judicial review, we join the majority of circuits that have considered the issue. In addition, we must decide whether the particular facts of this case support the district court's order that the juveniles be transferred for adult criminal prosecution. For the reasons that follow, we affirm the order of the district court.
 
 I. BACKGROUND
 
 2
 During a two-week period in the spring of 1995, a series of armed robberies took place in Denton and Dallas counties in northeast Texas. In connection with the robberies, the government filed a thirteen-count complaint on March 25, 1996, against four juvenile males identified as J.R.P., J.C.L.,[1] G.A.B., and B.G.B. The complaint alleged that the juveniles conspired to interfere with interstate commerce by threats and violence in violation of 18 U.S.C. § 1951, used and carried firearms during and in relation to crimes of violence in violation of the Hobbs Act, 18 U.S.C. § 924(c)(1), and aided and abetted the commission of offenses against the United States in violation of 18 U.S.C. § 2. A sealed information containing identical charges was filed on April 8, 1996.
 
 
 3
 The alleged overt acts in support of the charges are as follows. Just after midnight on May 16, 1995, J.R.P. and B.G.B. approached an individual at an automated teller machine ("ATM") in Carrollton and demanded that the individual hand over the cash that he intended to deposit. One of the two juveniles pointed a handgun at the victim and also hit him with the handgun. A few hours later, J.R.P. and G.A.B. entered an Exxon service station in Dallas, pointed a handgun at the clerk, and took approximately $250 from the cash register. This early morning spree continued at a Carrollton Texaco station, where J.R.P. and G.A.B. pointed a gun at the clerk, pulled the trigger (for unknown reasons, the gun did not discharge), and took over $200 in cash and lottery tickets. On the night of May 29, 1995, J.R.P., B.G.B., J.C.L., and a fourth individual entered a Dairy Queen in Dallas armed with a sawed-off shotgun, two handguns, and a broom handle. They pointed the guns at the restaurant employees, beat the employees with the guns and broom handle, and took approximately $1633 from the restaurant. Two days later, on May 31, 1995, G.A.B. and two other individuals robbed a Budget Inn in Lewisville at gunpoint, taking approximately $800. Also on May 31, 1995, J.R.P., J.C.L., and three others drove to the Fun Time Pizza Restaurant in Carrollton, armed with two sawed-off shotguns and a handgun, apparently intending to commit a robbery. Finally, on the night of June 1, 1995, J.R.P., armed with a shotgun, entered a Little Caesar's Pizza Restaurant in Lewisville and robbed both the restaurant and a customer. It is undisputed that appellants were juveniles at the time of these alleged acts.[2]
 
 
 4
 On the same date that the complaint was filed, the government also filed a certification to proceed against the juveniles in federal court and a motion to transfer the juveniles for adult criminal prosecution, both pursuant to 18 U.S.C. § 5032. Consistent with the requirements of § 5032, the certification averred that the charged offenses are felony crimes of violence, and:
 
 
 5
 3. There is substantial federal interest in the case to warrant the exercise of federal jurisdiction due to the extremely serious nature of the crime and the fact that interstate commerce was affected.
 
 
 6
 4. Furthermore, the State of Texas does not have available programs and services adequate for the needs of the Defendants.
 
 
 7
 Appellants filed motions to dismiss for lack of jurisdiction on the ground that the certification failed to state a substantial federal interest and that the State of Texas does have available programs and services adequate for the needs of juveniles.
 
 
 8
 While appellants' motions to dismiss were pending, hearings on the government's transfer motions were held before a magistrate judge. On May 3, 1996, the magistrate judge filed a separate report and recommendation as to each juvenile in which he recommended transfer for adult prosecution. Appellants filed timely objections. On May 23, 1996, the district court entered an order overruling these objections and adopting the reports and recommendations of the magistrate. In the same order, the district court denied appellants' motions to dismiss for lack of jurisdiction on the ground that, absent an allegation of bad faith, the court was without authority to review the substantive assertions of the government's certification under 18 U.S.C. § 5032.
 
 
 9
 J.R.P., G.A.B., and B.G.B. appeal the district court's order granting the government's motion to transfer them for adult criminal prosecution. Specifically, appellants contend that there is no basis for federal jurisdiction because the government did not meet its burden of proof regarding a "substantial Federal interest" in the case.[3] Each appellant also argues that his particular circumstances do not warrant transfer for criminal prosecution under the relevant statutory factors, and that therefore the district court abused its discretion in granting the government's transfer motion.
 
 
 10
 The government argues that the Attorney General's certification to proceed under 18 U.S.C. § 5032 is akin to the exercise of prosecutorial discretion and is not reviewable absent an allegation of bad faith. The government argues in the alternative that the evidence does establish that a substantial federal interest exists in this case. Finally, the government contends that the detailed factual findings underlying the decision to transfer appellants for criminal prosecution indicate that the court below weighed the statutory factors properly and thoroughly and did not abuse its discretion in granting the motion to transfer.
 
 II. DISCUSSION
 
 11
 We consider two issues in this appeal: first, whether the government's certification that the juvenile offenses involve a "substantial Federal interest" to warrant the exercise of federal jurisdiction under 18 U.S.C. § 5032 is subject to judicial review[4] and second, whether the district court abused its discretion in concluding, based on an evaluation of the relevant statutory factors, that appellants should be prosecuted as adults. This court has jurisdiction to review the district court's order under § 5032 transferring appellants for adult criminal prosecution based on the collateral order exception to the final judgment rule. United States v. Bilbo, 19 F.3d 912, 914 (5th Cir.1994).
 
 
 12
 We begin with a brief overview of the relevant statutory framework. To proceed against a juvenile in federal court, the Attorney General[5] must certify to the appropriate district court, after investigation,
 
 
 13
 that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or an offense described in section 841, 952(a), 955, or 959 of title 21, and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.
 
 
 14
 If the Attorney General does not so certify, such juvenile shall be surrendered to the appropriate legal authorities of such State.
 
 18 U.S.C. § 5032.[6]
 
 15
 If federal jurisdiction is retained, the juvenile will be proceeded against in juvenile delinquency proceedings unless he requests to be proceeded against as an adult or the district court, upon motion by the Attorney General and after a hearing, determines that transfer for adult criminal prosecution would be "in the interest of justice." 18 U.S.C. § 5032.[7] Section 5032 sets forth six factors that the district court must consider in making such determination:
 
 
 16
 Evidence of the following factors shall be considered, and findings with regard to each factor shall be made in the record, in assessing whether a transfer would be in the interest of justice: the age and social background of the juvenile; the nature of the alleged offense; the extent and nature of the juvenile's prior delinquency record; the juvenile's present intellectual development and psychological maturity; the nature of past treatment efforts and the juvenile's response to such efforts; the availability of programs designed to treat the juvenile's behavioral problems.
 
 
 17
 Congress has made clear that certification and transfer are distinct processes in a federal action against a juvenile:
 
 
 18
 The criteria for prosecution of a juvenile as an adult are entirely separate from the criteria which governs [sic] whether a juvenile must be surrendered to State authorities. Only if the criteria for retaining Federal jurisdiction over a juvenile in the first instance ... are met, may there then be consideration of whether Federal prosecution, as opposed to a Federal juvenile delinquency proceeding, is appropriate.
 
 
 19
 S. REP. NO . 98-225, at 389 n. 10 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3529. See also United States v. I.D.P., 102 F.3d 507, 510 (11th Cir.1996); United States v. Juvenile Male # 1, 86 F.3d 1314, 1317 n. 4 (4th Cir.1996). The government's certification thus invokes federal jurisdiction but does not itself trigger adult criminal prosecution of a juvenile. We accordingly consider whether the government's certification that there is a "substantial Federal interest" in the case is subject to judicial review before reaching the issue of whether the district court properly concluded that transfer of appellants for adult criminal prosecution was "in the interest of justice."
 
 A. Certification
 
 20
 The "substantial Federal interest" category for retention of federal jurisdiction over a juvenile was added to existing law as part of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98-473, § 1201(a), 98 Stat. 1837, 2149-50 (1984), in an effort to expand federal authority to proceed against juveniles charged with particularly serious, violent offenses in criminal prosecutions rather than juvenile delinquency proceedings. See S. REP. NO . 98-225, at 387, reprinted in 1984 U.S.C.C.A.N. at 3527.[8] To date, three circuits have considered whether certification based on a "substantial Federal interest" is subject to judicial review.[9] The Third and Eleventh Circuits have held that such certification is not reviewable. See Impounded (Juvenile R.G.), 117 F.3d 730 (3d Cir.1997); United States v. I.D.P., 102 F.3d 507 (11th Cir.1996).[10] The Fourth Circuit, in United States v. Juvenile Male # 1, 86 F.3d 1314 (4th Cir.1996), held that such certification is reviewable. Chief Judge Wilkinson concurred in the judgment but concluded that the government's certification that there is a "substantial Federal interest" in the case to warrant the exercise of federal jurisdiction is not subject to judicial review. Id. at 1324. Our analysis of the language, structure, and legislative history of § 5032 leads us to conclude, along with Judge Wilkinson and the Third and Eleventh Circuits, that Congress did not intend for the courts to second-guess the Attorney General's determination that a "substantial Federal interest" exists in a particular case.
 
 
 21
 Section 5032 provides that a juvenile shall not be proceeded against in any federal court "unless the Attorney General, after investigation, certifies ... that the offense charged is a crime of violence that is a felony ... and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." The statute does not contain any provision authorizing judicial review of the Attorney General's certification. See I.D.P., 102 F.3d at 511; Juvenile Male # 1, 86 F.3d at 1324 (Wilkinson, C.J., concurring); United States v. Vancier, 515 F.2d 1378, 1380 (2d Cir.1975). In significant contrast, the transfer provisions of § 5032 specifically authorize the district court, upon motion by the Attorney General, to hold a hearing, make findings, and determine whether a transfer would be in the interest of justice. As Judge Wilkinson correctly observes, "[t]he statute thus explicitly requires judicial review of the Attorney General's motion for transfer, yet contains no provision for judicial review of the Attorney General's certification of a 'substantial Federal interest.' " Juvenile Male # 1, 86 F.3d at 1324 (Wilkinson, C.J., concurring) .[11] In the absence of evidence to the contrary, it is presumable that Congress deliberately provided for judicial review of transfer but not certification: " 'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir.1972)).
 
 
 22
 Consistent with the omission of any provision authorizing judicial review of the government's certification of a "substantial Federal interest," § 5032 provides no standards to guide any such inquiry. See Impounded (Juvenile R.G.), 117 F.3d 730, 731; I.D.P., 102 F.3d at 511; Juvenile Male # 1, 86 F.3d at 1324-25 (Wilkinson, C.J., concurring). Indeed, the statute does not even define the term "substantial Federal interest." Again, the absence of guidance in this respect contrasts significantly with the transfer provisions of § 5032, which include a list of six specific factors that the district court must consider when determining whether a transfer would be "in the interest of justice." We find it difficult to conclude that Congress intended to leave the courts to their own devices in determining whether a "substantial Federal interest" exists "to warrant the exercise of Federal jurisdiction," while specifying with such care the considerations that must inform a court's evaluation of whether a transfer would be "in the interest of justice" in a particular case.
 
 
 23
 The omission of a definition of "substantial Federal interest" and of criteria for review may be explained by the fact that the term "substantial federal interest" is used extensively in the United States Attorneys' Manual to guide the exercise of federal prosecutorial discretion. As a general principle of federal prosecution, an otherwise appropriate prosecution should be declined where "[n]o substantial federal interest would be served by prosecution." U.S. Dept. of Justice, U.S. Attorneys' Manual § 9-27.220. In effect, a "substantial federal interest" inquiry is integral to every decision whether to prosecute.[12] Section 9-27.230 sets forth the substance of such inquiry:In determining whether prosecution should be declined because no substantial federal interest would be served by prosecution, the attorney for the government should weigh all relevant considerations, including:
 
 
 24
 1. Federal law enforcement priorities;
 
 
 25
 2. The nature and seriousness of the offense;
 
 
 26
 3. The deterrent effect of prosecution;
 
 
 27
 4. The person's culpability in connection with the offense;
 
 
 28
 5. The person's history with respect to criminal activity;
 
 
 29
 6. The person's willingness to cooperate in the investigation or prosecution of others; and
 
 
 30
 7. The probable sentence or other consequences if the person is convicted.
 
 The Supreme Court has recognized that
 
 31
 the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.
 
 
 32
 Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985); see also Juvenile Male # 1, 86 F.3d at 1325-26 (Wilkinson, C.J., concurring). The government's certification that a case involves a "substantial Federal interest" involves considerations similarly ill-suited to judicial review. We agree that " 'the government's authority to certify that a given case implicates a substantial federal interest is akin to the government's authority to decide which cases to prosecute.' " Juvenile Male # 1, 86 F.3d at 1325 (Wilkinson, C.J., concurring) (quoting United States v. Juvenile Male, 915 F.Supp. 789, 793 (W.D.Va.1995)); see also I.D.P., 102 F.3d at 511 ("In the context of certification under [§ 5032], the government's authority to ascertain the presence of a substantial federal interest is no different from its authority to decide whether to prosecute a case in a federal forum.").
 
 
 33
 The legislative history of the 1984 amendment to § 5032 also indicates congressional intent to vest the federal prosecutor, not the court, with authority to decide whether a substantial federal interest exists in a particular case. With regard to the addition of a third category to permit federal action against a juvenile where there is a substantial federal interest and the offense is a felony crime of violence or one of several enumerated drug offenses, the Senate Report states that
 
 
 34
 [t]his change adopts in part the recommendation of the Attorney General's Task Force on Violent Crime that the Federal Government assume original jurisdiction over Federal crimes by juveniles, and is substantially the same as a provision in the Criminal Code Reform legislation approved by the Committee in the last Congress.
 
 
 35
 S. REP. NO . 98-225, at 389, reprinted in 1984 U.S.C.C.A.N. at 3529 (footnote omitted). The report goes on to cite Senate Report No. 97-907 concerning the referenced legislation, which states that
 
 
 36
 the Committee has added a third category to existing law that would permit the disposition of a case involving a juvenile charged with a major felony by means of a Federal proceeding. This would be permissible ... if the Attorney General certifies that the offense charged is a Class A, B, C, or D and that there is a "sufficient Federal interest in the case to warrant the exercise of Federal jurisdiction." ... The Committee has limited the provision to the more serious Federal felonies in the belief that the Federal government should still defer to State authorities for less serious offense [sic] by juveniles. The Committee intends that the Federal prosecutor will consider the factors set forth in section 205 (with particular attention directed to subsection (b)(2) [sic] in deciding whether there is a "sufficient Federal interest in the case." It is believed necessary to afford the Attorney General this authority when a serious crime occurs in which there is a special Federal interest.
 
 
 37
 S. REP. NO . 97-307, 97th Cong., 1st Sess., 1179 (1981). As the Eleventh Circuit has observed
 
 
 38
 [n]ot only does the report explicitly acknowledge that the legislation was designed to afford the Attorney General the authority to decide whether a federal interest exists but, perhaps more importantly, refers the federal prosecutor to a different section of the bill setting forth proposed criteria that a prosecutor should consider in deciding whether to seek a federal prosecution.
 
 
 39
 I.D.P., 102 F.3d at 512. The section to which the federal prosecutor is referred, section 205, concerns the exercise of concurrent federal jurisdiction and sets forth criteria for determining whether a "sufficient Federal interest" exists to warrant the exercise of federal jurisdiction. The Report makes clear that this determination involves consideration of factors that generally inform the exercise of prosecutorial discretion:
 
 
 40
 [s]ubsection (b) ... lists some of the considerations or circumstances that indicate the presence of a sufficient Federal interest. These include generally applicable considerations that would ordinarily influence a prosecutor in deciding whether to exercise Federal jurisdiction: the gravity of the Federal offense as compared to the State or local offense, the relationship of the offense to another Federal offense committed by the accused, and the relative likelihood of prompt and effective investigation and prosecution by Federal, State or local authorities in light of available resources and the nature and scope of the criminal activity involved.
 
 
 41
 S. REP. NO . 97-307, at 57. The Report further states, in express terms, the Committee's intent that a determination of a sufficient federal interest is not subject to judicial review. See id. at 58-59. The provision, then, that Congress characterizes as "substantially the same as" § 5032 is one under which the determination of a sufficient federal interest was intended to be immune from judicial review. If this reference in the legislative history of § 5032 is to have any meaning, then the determination of a substantial federal interest under § 5032 was likewise intended to be a matter for federal prosecutors, not federal courts.
 
 B. Transfer for Adult Criminal Prosecution
 
 42
 Appellants contend that the district court abused its discretion in granting the government's motion to transfer because there was insufficient evidence to support the findings made in regard to each of the factors set forth in § 5032. Here, the magistrate judge held hearings and made written findings with respect to each appellant indicating whether each of the six factors weighed in favor of or against transfer or was neutral. The district court subsequently adopted these findings.
 
 
 43
 "The decision whether to transfer a juvenile to trial as an adult under 18 U.S.C. § 5032 is within the sound discretion of the trial court, provided the court employs and makes findings as to the six criteria outlined in the Code." United States v. Doe, 871 F.2d 1248, 1255 (5th Cir.), cert. denied, 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989). Based upon its findings as to the statutory factors, the district court may order adult prosecution of a juvenile if it would be "in the interest of justice." 18 U.S.C. § 5032; Bilbo, 19 F.3d at 915. We review the court's decision to transfer for abuse of discretion and its underlying factual findings for clear error. United States v. Three Male Juveniles, 49 F.3d 1058, 1060, 1062 (5th Cir.1995).
 
 
 44
 In conducting the six-factor analysis, the district court is not required to weigh each factor equally. Doe, 871 F.2d at 1254-55. The seriousness of the offense, for instance, "can be given more weight than other factors in determining whether there is a 'realistic chance' of rehabilitation, and hence whether a transfer is appropriate." Id. at 1255. While rehabilitation is a priority of the juvenile justice system, "[t]he finding of rehabilitative potential is a test which is within the sound discretion of the trial court; that court may want more than a 'glimmer of hope' that rehabilitation will be efficacious." Id. at 1253.
 
 
 45
 We consider each appellant's challenges to the district court's findings in turn. Again, the six statutory factors are: (1) the age and social background of the juvenile, (2) the nature of the alleged offense, (3) the extent and nature of the juvenile's prior delinquency record, (4) the juvenile's present intellectual development and psychological maturity, (5) the nature of past treatment efforts and the juvenile's response to such efforts, and (6) the availability of programs designed to treat the juvenile's behavioral problems. 18 U.S.C. § 5032.
 
 
 46
 1. J.R.P.
 
 
 47
 The court found that five of the factors favored transfer of J.R.P. for adult prosecution with one factor, his social background, being neutral or favoring transfer. J.R.P. contends that the evidence was insufficient to support the court's findings with regard to each of the six factors, and that the court's finding regarding availability of federal programs for juveniles was erroneous.
 
 
 48
 The district court found that J.R.P. was at least 17 1/2 years old at the time of the offenses. Although J.R.P. contends that the court failed to provide any explanation as to why his age weighed in favor of transfer, the court reasoned that "at the time of the offense, he was rapidly approaching the age at which he should be held accountable for his actions under the adult criminal justice system."
 
 
 49
 As to his social background, J.R.P. maintains that his "shattered home life" should weigh in favor of an opportunity for rehabilitation. According to the court's undisputed findings, J.R.P. lived with his mother in Indiana until he was approximately five years old, at which point his grandfather moved in because his mother was leaving J.R.P. unattended and uncared for. J.R.P. was officially placed in his grandfather's care in 1985 as a result of his mother's substance abuse. Following his grandfather's death in 1991, J.R.P. moved in with his aunt, Loretta Turner, in Dallas. The court found that Turner provided a nurturing and loving atmosphere, while also being strict with J.R.P. and demanding respect. During the years he lived with Turner, J.R.P. ran away ten times. At school, he was involved in a fight and criminal mischief and was suspended several times for failing to follow school rules. This evidence was certainly sufficient to support the district court's conclusion that "[i]t is probable that the absence of a strong family environment would make rehabilitation prospects for the juvenile unlikely." According to the court, "[t]he family support necessary for [J.R.P.] to avoid future criminal activity is likely lacking. His mother and father have offered no guidance or support for him and his aunt has been unable to control his behavior although she has tried." We note in addition that J.R.P.'s social background was not a significant factor in the court's overall decision to transfer; based on the evidence, the court concluded that J.R.P.'s social background "could be considered neutral or favoring transfer."
 
 
 50
 Evidence concerning the nature of the offense likewise was sufficient to support the court's conclusion that this factor "weighs very strongly in favor of transfer." Federal Bureau of Investigation Special Agent Paul Shannon testified as to J.R.P.'s role in each of the charged offenses. According to Agent Shannon, the ATM robbery was planned in advance by J.R.P. and B.G.B., who had stolen a van and were hiding when the victim approached the ATM. Although B.G.B. wielded the handgun and pistol-whipped the victim, J.R.P. did the talking, collected the money, and appeared to be the leader. Agent Shannon testified that he believed the Exxon robbery was also planned and J.R.P. the leader. J.R.P. and G.A.B. entered the Exxon station and J.R.P. asked for cigarettes. After the clerk opened the cash register, G.A.B. pulled a revolver on the clerk while J.R.P. went behind the counter, knocked the security camera out of range, and retrieved the money. The ensuing Texaco robbery followed the same procedure: G.A.B. pulled the revolver while J.R.P. collected the money and lottery tickets. Again, in Agent Shannon's opinion, J.R.P. was the leader. The Dairy Queen robbery was particularly violent. At closing time, the three juveniles entered the restaurant from the back door wearing masks and gloves. J.R.P. was armed with a 9mm handgun. The employees were placed on the floor and appellant B.G.B., a former Dairy Queen employee, used a sawed-off shotgun to beat one of the employees to the point of unconsciousness. J.R.P. pointed his gun at the manager and demanded to have the safe opened. J.R.P. collected the money in a box and maintained control over the box. The juveniles then placed the employees in the cooler, including the victim beaten by B.G.B. who had to be dragged in. Agent Shannon testified that J.R.P., J.C.L., and others planned to rob the Fun Time Pizza Restaurant on May 31, 1995, but were unsuccessful in their first attempt. A second attempt the following day, also involving J.R.P., was aborted when the juveniles spotted police cars in the vicinity. Finally, Agent Shannon testified that J.R.P., armed with a shotgun, single-handedly held up the Little Caesar's Pizza Restaurant. The customer targeted during the offense testified that he was pushed to the ground and J.R.P. kept one foot on his back while holding the shotgun to his head. J.R.P. yelled to the employees that he would kill the customer if they did not hand over the money. J.R.P. fled with the money and the customer's wallet. J.R.P.'s argument that there was insufficient evidence concerning his role in the alleged offenses is without merit.
 
 
 51
 With regard to the extent and nature of his prior delinquency record, J.R.P. argues that this factor weighs against transfer because no evidence was presented to indicate that J.R.P. is incapable of rehabilitation. The court found that in early 1993, J.R.P. was charged three times as a runaway. After the third incident, he was required to attend a special program of the Denton County Probation Department. On July 30, 1993, J.R.P. was adjudged to have engaged in delinquent conduct and to be a child in need of supervision, and received twelve months of probation for a runaway offense. J.R.P. faced runaway charges six more times between August 1993 and August 1994. On October 3, 1994, J.R.P.'s probation was modified and he was placed in Denton County Long Term Care Detention. In addition to his numerous runaways, J.R.P. was charged in 1993 with theft of under $200 and in 1995 with theft of over $1500. On March 21, 1996, J.R.P. pled guilty to adult charges in state court of engaging in organized criminal activity.[13] This evidence was sufficient to support the court's conclusion that this factor weighs in favor of transfer. The evidence indicates, as the court found, that J.R.P.'s delinquency record "demonstrates a pattern of continuous lack of respect for authority. Although most of his prior offenses are non-violent runway [sic] charges, it indicates that his criminal activity is not an isolated event, but has continued despite prior corrective and rehabilitative effort in state court."
 
 
 52
 J.R.P.'s challenge to the court's conclusion regarding his present intellectual development and psychological maturity is based on the fact that the government's expert, Dr. Karen Cogan, is a psychologist rather than a medical doctor, and on the limits of Dr. Cogan's evaluation of J.R.P. In effect, J.R.P. challenges Dr. Cogan's credibility. Not only are we loathe to disturb the lower court's credibility determinations on the basis of a cold record, but we also note that in finding this factor favorable to transfer, the district court relied on the testimony of J.R.P.'s witnesses as well as that of Dr. Cogan. The court noted that several of J.R.P.'s witnesses testified that J.R.P. was intellectually mature, but emotionally immature, and that at least two of J.R.P.'s witnesses testified that they believed J.R.P. understood the difference between right and wrong. Dr. Cogan's evaluation, moreover, also supports the court's conclusion that J.R.P. has sufficient intellectual development and maturity to be treated as an adult. Dr. Cogan found J.R.P. to be of average intelligence, able to interact in an adult world, capable of controlling his actions if he chose, and understanding the difference between right and wrong. Dr. Cogan also found that J.R.P.'s refusal to complete all of the testing and his questions about how the information would be used were indicative of the degree of his understanding.
 
 
 53
 J.R.P. next contends that there was insufficient evidence to support the district court's conclusion that J.R.P.'s "poor response to previous treatment efforts weighs in favor of transfer." Although witnesses testified that they believed that J.R.P. could be rehabilitated, there was ample evidence to support the district court's conclusion that rehabilitative efforts were not likely to succeed. The court noted that J.R.P.'s family and friends had given him time, energy, love, and counseling, to which he did not respond favorably, and that extensive state efforts at rehabilitation have been to no avail.
 
 
 54
 Finally, J.R.P. contends that the court clearly erred in finding that facilities available through the Bureau of Prisons "offer little in the way of programs for the juveniles." J.R.P. does not, however, identify any evidence to the contrary. The testimony of U.S. Probation Officer James Parsons supports the court's finding that the Bureau of Prisons, either through its own facilities or through private contract facilities, is ill-equipped to treat the behavioral problems of juveniles. Even if this factor did not weigh in favor of transfer, the court would not have abused its discretion in ordering the transfer on the basis of the other factors.
 
 
 55
 2. G.A.B.
 
 
 56
 The district court found that five of the factors favored transfer of G.A.B. to adult status with one factor, his social background, being neutral or favoring transfer. In his objections to the magistrate judge's report and recommendations and on appeal, G.A.B. challenges only the court's findings as to the sixth factor, the availability of programs to treat his behavioral problems.
 
 
 57
 As to the first five factors, the court made the following findings: G.A.B. reached the age of 17 during the two-week period of the offenses. He has a troubled family background with no substantial parental influence or guidance; he has had little or no contact with his natural father and his mother has been unable to control his behavior. The charges against G.A.B. are quite serious. He allegedly participated in the armed robberies of the Exxon station, the Texaco station, and the Budget Inn. During the Exxon robbery, G.A.B. pointed a cocked revolver at the clerk. He similarly pointed his revolver at the clerk during the Texaco robbery, although he went one step further this time and pulled the trigger (as noted previously, the gun did not discharge). Agent Shannon testified that G.A.B. was the leader of the Budget Inn robbery. G.A.B. attempted to take the cash register while the night clerk was asleep. When the clerk awoke, G.A.B. pointed a gun at him and demanded that he open the register. G.A.B. has an extensive juvenile record beginning in 1991, including multiple burglaries, assaults, thefts, and motor vehicle offenses. He possesses an average range of intelligence and understands the difference between right and wrong. The court found that he has sufficient intellectual development and maturity to be treated as an adult. As a result of his past offenses, G.A.B. has been placed on informal probation/home detention, supervised probation, and one year of confinement at the Nacogdoches Boys' Ranch. All attempts at rehabilitation have failed; the staff at the Boys' Ranch in fact requested that G.A.B. leave the institution.
 
 
 58
 G.A.B. does not contest the above findings, but argues that the government failed to meet its burden of proof regarding the lack of available programs designed to treat his behavioral problems and that the magistrate judge evaluated this factor based on an erroneous assumption. The evidence regarding available federal programs to treat G.A.B.'s behavioral problems was similar to that adduced at J.R.P.'s hearing and supported the court's finding that available facilities "offer little in the way of programs for the juveniles." As to the alleged erroneous assumption, G.A.B. contends that the magistrate judge erroneously stated that a factor favoring transfer was that, if prosecuted and convicted as an adult, G.A.B. could be placed in an adult facility. The magistrate judge's report states that "[a] juvenile defendant who is prosecuted and convicted as an adult can be placed in an adult facility once he reaches the age of eighteen; whereas, a juvenile prosecuted and convicted as a juvenile must remain in a contract facility until the age of twenty-one." According to Parsons's testimony, if G.A.B. were transferred, he would be housed at a contract facility until "old enough and mature enough to be placed in the federal inmate population." We do not understand the magistrate judge's statement to assume that G.A.B. would be placed immediately in an adult facility; even if the report incorporates an erroneous assumption in this regard, it does not affect the court's key finding that the Bureau of Prisons does not offer adequate programs to treat the behavioral problems of juveniles. In addition, the court's findings with regard to the other factors adequately support the decision to transfer. In light of the court's thorough findings, we do not find that the transfer decision constituted an abuse of discretion.
 
 
 59
 3. B.G.B.
 
 
 60
 The court found that four of the six factors favored transfer of B.G.B. to adult status. The court found that his social background was either neutral or favored transfer, and his age at the time of the offenses, 15 1/2 years old, weighed against transfer. On appeal, B.G.B. contends that the transfer order was an abuse of discretion because there was insufficient evidence with regard to each of the statutory factors.
 
 
 61
 As with his older brother G.A.B., the court found that B.G.B. has a troubled family background with no substantial parental influence or guidance. B.G.B. contends that the evidence concerning his home life is insufficient to weigh significantly in the decision to transfer. The court effectively agreed, concluding that B.G.B.'s social background "could be considered neutral or favoring transfer."
 
 
 62
 B.G.B. argues that the nature of his alleged offenses should not weigh in favor of transfer because the government did not present evidence to distinguish these armed robberies from any other armed robberies committed by juveniles in the Eastern District of Texas. B.G.B. allegedly participated in the ATM holdup and the Dairy Queen robbery. According to the testimony of Agent Shannon, B.G.B. pulled a gun on the victim of the ATM robbery and, after the victim handed over his cash, proceeded to pistol whip him in the head and face. The court found that "this attack was very violent and was an example of personalized violence." In addition, as noted previously, this robbery appeared to be planned in advance. The Dairy Queen incident involved even more brutal conduct. B.G.B. was a former employee of the restaurant. It was B.G.B. who, armed with a sawed-off shotgun, beat one of the employees unconscious. After obtaining the money they sought, the juveniles placed all the employees in the cooler, dragging the victim beaten by B.G.B. According to the magistrate's report, "[t]he pictures of the crime scene show pools of blood in the cooler and in the location of the beating." Agent Shannon testified that the Dairy Queen robbery was a "takeover" robbery, which he considered to be one of the most violent types. The evidence clearly supports the court's findings, and the court was within its discretion to weigh this factor "very strongly in favor of transfer." See Doe, 871 F.2d at 1255.
 
 
 63
 B.G.B. similarly challenges the court's decision to weigh the extent and nature of B.G.B.'s prior delinquency record in favor of transfer, arguing that no evidence was presented as to why B.G.B.'s prior record in particular merits federal prosecution. B.G.B. attempts to alter the nature of the statutory inquiry, which is to evaluate the six factors and determine whether transfer for adult criminal prosecution, as distinguished from transfer to federal prosecution, is "in the interest of justice." B.G.B. offers no support for the novel proposition that the government must prove that his delinquency record stands out from all others for purposes of transfer. B.G.B. does not dispute that his prior delinquency record is lengthy. He was arrested in 1992 for burglary and was placed on informal probation. In early 1993 he was adjudged to have engaged in delinquent conduct for theft of a pistol, for which he received counseling and was placed on intensive supervision probation with electronic monitoring. His probation was revoked in July 1993, however, based on his participation in a robbery and assault of a young boy. B.G.B. was thereupon placed at Nacogdoches Boys' Ranch for one year. After his release, B.G.B. was again adjudicated for an assault. B.G.B.'s junior high school records indicate over twenty discipline referrals in one year from different classroom teachers. The record clearly supports the court's conclusion that "[B.G.B.'s] delinquency record is extensive and involves serious charges. It indicates that his criminal activity is not an isolated event, but has continued despite prior corrective and rehabilitative effort in state court."
 
 
 64
 With regard to his present intellectual development and psychological maturity, B.G.B. contends that the evidence indicates that his behavior will be positive if he is surrounded by positive influences. B.G.B. bases this on the statement of Dr. Darrell Horton, a psychologist, that B.G.B. "has a strong need to be accepted or approved of." The court recognized that, according to Dr. Horton, B.G.B. is easily influenced by others. The court also credited, however, Dr. Horton's testimony that there are no long term positive role models in B.G.B.'s life and that the public would be at risk if B.G.B. were released. The court further stated, "Dr. Horton also found that it would be extremely difficult to rehabilitate [B.G.B.] and would not be possible [sic] prior to his twenty-first birthday." The court's findings are supported by the record and the court did not abuse its discretion in weighing this factor in favor of transfer.
 
 
 65
 With regard to past treatment efforts and B.G.B.'s response thereto, B.G.B. contends that the evidence shows that, contrary to the court's finding, he responded favorably to treatment. B.G.B. argues that the testimony of Dot Martin, Director of Nacogdoches Boys' Ranch, indicates that there was a reduction in B.G.B.'s aggressiveness during each of the reporting periods. Martin's testimony did indicate that the number of reported aggressive incidents dropped from over ten during the first three months to six during the second three months. Martin did not, however, testify as to the number of aggressive incidents reported during the third three-month period. She testified, rather, to one incident that stood out in her mind. Significantly, B.G.B. fails to note Martin's testimony that B.G.B. did not accept responsibility for his actions, even during the third reporting period, and that, despite the staff's efforts to do everything they could to rehabilitate B.G.B., they were ultimately unsuccessful. A number of other witnesses also testified that B.G.B.'s response to past treatment indicated that he could not be rehabilitated before his twenty-first birthday. The court's findings are amply supported by the record and the court did not abuse its discretion in weighing this factor in favor of transfer.
 
 
 66
 Finally, with respect to the availability of programs designed to treat his behavioral problems, B.G.B. challenges the court's findings on the same grounds asserted by G.A.B. Our reasoning with respect to G.A.B.'s arguments applies equally here. We find it significant, moreover, that Parsons was personally familiar with B.G.B.'s case and stated that in his opinion B.G.B. could not be rehabilitated in the federal juvenile system. In light of all the evidence and the broad discretion of the district court to weigh the various factors in determining whether transfer would be in the interest of justice, we conclude that the court did not abuse its discretion in granting the motion to transfer here.
 
 III. CONCLUSION
 
 67
 For the reasons discussed, we AFFIRM the order of the district court transferring appellants for adult criminal prosecution.
 
 
 
 *
 District Judge of the Eastern District of Texas, sitting by designation
 
 
 [1]
 This court granted J.C.L.'s motion to withdraw his appeal on November 26, 1996. Appellants are J.R.P., G.A.B., and B.G.B
 
 
 [2]
 During the period of the offenses, J.R.P. was 17 years old, G.A.B. turned 17 years old, and B.G.B. was 15 years old. Under the Juvenile Justice and Delinquency Prevention Act, a "juvenile" is "a person who has not attained his eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday." 18 U.S.C. § 5031. "Juvenile delinquency" is defined as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." Id
 
 
 [3]
 As indicated in our discussion infra, § 5032 provides three alternative grounds for proceeding against a juvenile in federal court, one of which requires certification that the charged offenses were felony crimes of violence and that there is a substantial federal interest in the case to warrant federal jurisdiction, and another of which requires certification that the state lacks available services and programs adequate for the needs of juveniles. On appeal, J.R.P. and G.A.B. raise challenges to the government's certification with regard to both grounds. Because the first ground was adequate to support the government's decision to bring a proceeding in federal court, we need not consider the adequacy of the second ground. Accordingly, this opinion does not address either the reviewability or the substantive merit of the government's certification insofar as it concerns any lack of programs and services for juveniles in Texas
 
 
 [4]
 The parties state this issue in more general terms as whether the government's certification under § 5032 is reviewable. As indicated in note 3, supra, we limit our consideration of reviewability to certifications invoking the "substantial Federal interest" basis for federal jurisdiction
 
 
 [5]
 The Attorney General has delegated her certification authority under 18 U.S.C. § 5032 to the United States Attorneys. 28 C.F.R. § 0.57
 
 
 [6]
 We recognize that, as drafted, § 5032 can be read to require that the certifying party must, in all cases, certify that there is a substantial federal interest in addition to one of the three enumerated circumstances. However, we agree with the Third Circuit that such a reading does not comport with the legislative history of the 1984 amendment to § 5032. See Impounded (Juvenile R.G.), 117 F.3d 730, 731 (3d Cir.1997); see also discussion infra Part II.A. As explained by the Senate Report, the 1984 amendment
 added a third category to existing law that would permit the disposition of a case involving a juvenile charged with a serious felony by means of a Federal proceeding. This would be permissible if the Attorney General certifies that the offense is a felony crime of violence or a serious drug offense described in 21 U.S.C. 841, 952(a), 955, or 959, and that there is a "substantial Federal interest in the case or offense to warrant the exercise of Federal jurisdiction."
 S. REP. NO . 98-225, at 389 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3529. The report goes on to state that the provision has been limited
 to serious violent felonies and drug offenses so that the Federal Government will continue to defer to State authorities for less serious juvenile offenses. Moreover, the Committee intends that a determination that there is a "substantial Federal interest" be based on a finding that the nature of the offense or the circumstances of the case give rise to special Federal concerns.
 Id. The report's discussion of the "substantial Federal interest" inquiry is contained within its discussion of this newly added "third category"; the report does not indicate that the "substantial Federal interest" inquiry was intended as a supplement to the first and second categories as well as a component of the third. Our reading is consistent with the underlying purpose of the amendment to expand federal authority to respond to the most serious juvenile crimes, rather than to restrict existing federal jurisdiction over juveniles.
 
 
 [7]
 The Attorney General may make a motion to transfer "with respect to a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence or an offense described in section 841, 952(a), 955, or 959 of title 21." 18 U.S.C. § 5032. Section 5032 also contains provisions for mandatory transfer to adult status which are not at issue in this case
 
 
 [8]
 The legislative history makes clear that prior to the 1984 amendment juveniles charged with federal offenses could be proceeded against in federal court only under the first two categories; specifically, under pre-amendment law such juveniles
 must be transferred to appropriate State authorities unless the Attorney General certifies, after investigation, that the State does not have or refuses to assume jurisdiction over the juvenile or that the State does not have available programs or services adequate for the needs of juveniles. Only if such a certification is made may the juvenile be proceeded against federally.
 S. REP. NO . 98-225, at 387, reprinted in 1984 U.S.C.C.A.N. at 3527.
 
 
 [9]
 Prior to enactment of the "substantial Federal interest" category, the Second and Eleventh Circuits had held that a government certification under § 5032 was not reviewable. See United States v. C.G., 736 F.2d 1474 (11th Cir.1984); United States v. Vancier, 515 F.2d 1378 (2d Cir.), cert. denied, 423 U.S. 857, 96 S.Ct. 107, 46 L.Ed.2d 82 (1975). The asserted basis for federal jurisdiction in C.G. and Vancier was the lack of state jurisdiction over the juvenile. While neither case addresses the reviewability of a certification asserting a "substantial Federal interest," much of their reasoning is relevant here
 
 
 [10]
 In both of these cases the courts noted exceptions to the rule of nonreviewability to permit review for formal compliance with § 5032 and where the juvenile has alleged that the government filed the certification in bad faith. Impounded (Juvenile R.G.), 117 F.3d 730, 731; I.D.P., 102 F.3d at 511. Similarly, the Eighth and Second Circuits have reviewed whether the charged offenses were "crimes of violence" within the meaning of § 5032. See United States v. Doe, 49 F.3d 859 (2d Cir.1995); United States v. Juvenile Male, 923 F.2d 614 (8th Cir.1991). (In neither case did the court consider whether the government's certification was substantively reviewable, either in general or with respect to the existence of a substantial federal interest.) None of these recognized occasions for limited review is implicated in this case. Accordingly, we do not consider the propriety of review under these circumstances
 
 
 [11]
 The Fourth Circuit notes that "the lack of a specific provision addressing judicial review is in and of itself no bar to review." Juvenile Male # 1, 86 F.3d at 1319. While this may be accurate as a general proposition, the absence of a judicial review provision takes on greater significance where, as here, the same statute expressly provides for judicial review of a different matter. See Juvenile Male # 1, 86 F.3d at 1324 (Wilkinson, C.J., concurring). Moreover, the case on which the Fourth Circuit majority relies, Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995), turned on circumstances not present here. See I.D.P., 102 F.3d at 513 n. 6; Juvenile Male # 1, 86 F.3d at 1326 n. 2 (Wilkinson, C.J., concurring). Lamagno concerned the reviewability of the Attorney General's certification under the Westfall Act, 28 U.S.C. § 2679(d)(1), that the defendant-employee was acting within the scope of his employment at the time of the incident in question. In concluding that the certification was reviewable, the Court indicated that two factors weighed heavily in its analysis:
 First, the Attorney General herself urges review, mindful that in cases of the kind petitioners present, the incentive of her delegate to certify is marked. Second, when a government official's determination of a fact or circumstance--for example, "scope of employment"--is dispositive of a court controversy, federal courts generally do not hold the determination unreviewable.
 515 U.S. at ----, 115 S.Ct. at 2231. In this case, the Attorney General does not urge review and any "incentive" to certify as existed in Lamagno (the certification there effectively immunized the United States from suit) does not come into play where the government certifies that a substantial federal interest exists that warrants the exercise of federal jurisdiction over a juvenile matter. Likewise, a certification under § 5032 does not dispose of the controversy. We recognize, as did the Supreme Court in Lamagno, that "judicial review of executive action 'will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.' " Id. (quoting Abbott Lab. v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). We conclude, however, that the text and legislative history of § 5032 indicate that Congress did not intend for the Attorney General's certification to be reviewable. See I.D.P., 102 F.3d at 513 n. 6.
 
 
 [12]
 Section 9-2.142 of the manual provides that a federal prosecution based on substantially the same acts involved in a prior state or federal proceeding is precluded unless the matter involves a "substantial federal interest." This section further provides that the determination whether the matter involves a "substantial federal interest" "will be made on a case-by-case basis, applying the considerations applicable to all federal prosecutions." For the relevant considerations, section 9-2.142 refers to section 9-27.230, which we discuss in the text infra
 
 
 [13]
 J.R.P. received a ten-year sentence, part of which involves participation in an alternative incarceration program, or "boot camp." Upon successful completion of this program, J.R.P. would receive probation. The boot camp program might not be available, however, if J.R.P. is convicted of another offense