IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-30284

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

SEALED APPELLANT 1; SEALED APPELLANT 2

Defendants - Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before GARWOOD, DAVIS, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge.

This case concerns the transfer of two juveniles to adult status for criminal prosecution in federal court for multiple charges relating to several alleged carjackings in the New Orleans area. One of the juveniles, D.W. ("D.W.") was charged with crimes arising from one alleged carjacking committed when he was 14 years old and one alleged carjacking committed when he was 15 years old, and the district court ordered he be transferred to adult status for trial on all of the charges against him. The statute authorizing such transfer, however, is not capable of a construction that supports transfer of a fourteen-year-old charged with the crimes in this case. Because D.W. is statutorily ineligible for transfer to adult status for the charges arising from the alleged carjacking committed

while he was 14, we REVERSE the district court's order of transfer as to these counts. We AFFIRM the district court's order transferring D.W. to adult status for prosecution on the charges stemming from the alleged carjacking committed after his fifteenth birthday. We AFFIRM the district court's order transferring J.S. ("J.S.") to adult status for trial on the charges stemming from two alleged carjackings, both committed after his fifteenth birthday, as well.

## I. BACKGROUND

The three carjackings at issue in this case involved an overlapping set of assailants, some of them defendants in this case and some of them not, on three distinct days. The other two juveniles mentioned in the below recitation, T.P. ("T.P.") and J.D. ("J.D."), were also arrested and charged, but their case was severed from the case against D.W. and J.S. that is currently before us.[1]

On July 21, 2006, while standing near her car, Lillian Blood ("Blood"), an elderly woman living in Jefferson Parish, Louisiana, was accosted by a black male, face covered in a white towel, who brandished a gun and demanded her car keys. Blood handed them over, and the perpetrator drove away. Approximately 90 minutes later, in the Carrollton area of Louisiana, Blood's car was involved in an accident; J.S., T.P., and D.W. jumped out and ran around the corner, where they threatened Alexandra Mompoint ("Mompoint") with a gun and stole her vehicle, driving it away from the scene. A neighbor, Michael Gaspard ("Gaspard"), who had witnessed the carjacking gave chase in his own car, and managed to stop the fleeing car by ramming the vehicle. Gaspard approached the vehicle but the driver shot at him, missing him, and then drove away. Other witnesses testified that about an hour after the second carjacking, three youths

---

[1] We need not determine the veracity of the following facts, which no judge or jury has found beyond a reasonable doubt, because we are entitled to presume the truth of the allegations against the defendants when reviewing a motion to transfer a juvenile to adult status for criminal prosecution in federal court. United States v. Doe, 871 F.2d 1248, 1250 n.1 (5th Cir. 1989).

driving the stolen car engaged in a drive-by shooting in the Carrollton area of New Orleans, wounding three men (none of them fatally). Another witness told the police that T.P. handed a pistol to D.W. and that D.W. shot the men.

Two days after these events Mompoint and Gaspard identified T.P. as one of the carjackers from a photographic line-up; Gaspard also identified J.S. Eventually T.P. was apprehended in New Orleans while driving Mompoint's car. J.S.'s fingerprints were found in both cars. Blood samples from Mompoint's car matched DNA from T.P. and J.S. Neither car contained D.W.'s fingerprints; a juice bottle with his DNA on it was found in Mompoint's car at the time it was retrieved, a day after it was stolen.

On November 15, 2006, Bryan Lewis ("Lewis") was getting into his car outside his residence in New Orleans when he was approached by J.S., who was carrying a semi-automatic handgun. J.S. jumped in the car and drove off. The next day, November 16, the police received a tip that the car was parked in the Carrollton area of New Orleans. They set up surveillance and saw four African-American males, including J.S. approach the car. The police stopped them for interviews and noted that J.S. matched the physical description Lewis had provided to the police. That afternoon Lewis positively identified J.S. from a photo lineup.

On March 17, 2007, J.D. approached a parked car in Jefferson Parish that was occupied by two teenagers, Bianca Garcia ("Garcia") and Patrick LeBlanc ("LeBlanc"). Garcia and LeBlanc told police that J.D. brandished a weapon and ordered them out of the car and drove off in it. He was followed by a dark-colored car from which he had exited near Garcia's house. Two days later, on March 19, 2007, the police recovered the stolen car. They found a fingerprint belonging to J.D. on a fast food box left inside the car. J.D. confessed to police and told them that D.W. had driven him to the location at which J.D. committed the carjacking

and had followed him back to Orleans Parish afterwards. D.W.'s DNA was found on a plastic spoon in the car.

D.W., J.S., T.D. and T.P. were charged in a second superseding juvenile bill of information in federal court; the latter two defendants were later severed and are not part of this appeal. D.W. and J.S. were charged with conspiracy to commit the two July 21, 2006 carjackings in violation of 18 U.S.C. §§ 371, 2119, and 5032; conspiracy to use and carry firearms during those carjackings in violation of 18 U.S.C. §§ 924 and 5032; and the substantive counts for the carjackings in violation of §§ 2119 and 5032. D.W. was also charged with conspiracy to carry and use firearms during the March 17, 2007 carjacking and with the substantive count of that carjacking, and J.S. was charged with the November 15, 2006 carjacking. The Government moved under 18 U.S.C. § 5032 to transfer the proceedings on the charges to adult criminal prosecution. The district court held the required hearing and received post-hearing briefing from the parties, after which it ordered that the defendants be transferred to adult criminal prosecutions. J.S. and D.W. moved for a stay pending appeal, which the district court granted. J.S. and D.W. timely appealed.

## II. ANALYSIS

18 U.S.C. § 5302 provides for federal jurisdiction over juveniles accused of certain crimes:

> A juvenile alleged to have committed an act of juvenile delinquency . . . shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or [certain drug crimes not at issue in this case], and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

4

The statute also provides for the transfer of certain juveniles to adult status, upon motion of the Attorney General, if such transfer would be "in the interest of justice." Specifically:

> [W]ith respect to a juvenile fifteen years and older alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence or an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), or section 1002(a), 1005, or 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, 959), or section 922(x) of this title, or in section 924(b), (g), or (h) of this title, criminal prosecution on the basis of the alleged act may be begun by motion to transfer of the Attorney General in the appropriate district court of the United States, if such court finds, after hearing, such transfer would be in the interest of justice. In the application of the preceding sentence, if the crime of violence is an offense under section 113(a), 113(b), 113(c), 1111, 1113, or, if the juvenile possessed a firearm during the offense, section 2111, 2113, 2241(a), or 2241(c), "thirteen" shall be substituted for "fifteen" and "thirteenth" shall be substituted for "fifteenth."

18 U.S.C. § 5032. This court has jurisdiction over the interlocutory appeal of a district court's transfer order of a juvenile to adult status under the collateral order doctrine. United States v. Juvenile No. 1, 118 F.3d 298, 302 (5th Cir. 1997).

We must address one preliminary matter before turning to the merits of the transfer decision made by the district court below, namely whether D.W. was eligible for transfer to adult status upon the Attorney General's motion for the carjackings allegedly committed on July 21, 2006, when he was only fourteen years old. It is elemental that "the starting point for interpreting a statute is the language of the statute itself." Consumer Prod. Safety Comm. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). 18 U.S.C. § 5032, reproduced above, begins by establishing the circumstances under which a juvenile fifteen years or older is eligible for a transfer hearing: when he is "alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence or an offense described in section 401 of the Controlled

Substances Act (21 U.S.C. 841), or section 1002(a), 1005, or 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, 959), or section 922(x) of this title, or in section 924(b), (g), or (h) of this title." It then provides that when a juvenile is between the ages of thirteen and fifteen, he shall be eligible for adult criminal prosecution "if the crime of violence is an offense under section 113(a), 113(b), 113(c), 1111, 1113, or, if the juvenile possessed a firearm during the offense, section 2111, 2113, 2241(a), or 2241(c)." The most logical reading of this sentence is that if a juvenile is between the ages of thirteen and fifteen he is eligible for a transfer hearing if (1) he is alleged to have committed a crime of violence that is an offense under section 113(a), 113(b), 113(c), 1111 or 1113, or (2) he is alleged to have committed an offense that is a crime of violence under section 2111, 2113, 2241(a) or 2241(c) and to have possessed a firearm while doing so. In other words, a juvenile between the ages of thirteen and fifteen must either be alleged to have committed an offense that is a crime of violence under the first set of statutes, or must be alleged to have possessed a firearm while committing an offense that is a crime of violence under the second set of statutes. In those two circumstances, the word "thirteen" in the provision concerning transfer hearings is substituted for "fifteen." Therefore, any juvenile between the ages of thirteen and fifteen who has not committed one of the first set of offenses listed or possessed a firearm while committing one of the second set of offenses listed, is not eligible for a transfer hearing.[2]

---

[2] The Government argues that the statute should be understood to identify three circumstances under which, if the crime alleged is a crime of violence, a juvenile between the ages of thirteen and fifteen is eligible for a transfer hearing: (1) offenses under sections 113(a), 113(b), 113(c), 1111, 1113; (2) offenses during which the juvenile is alleged to have possessed a firearm; and (3) offenses under sections 2111, 2113, 2241(a) or 2241(c). We do not believe the sentence is grammatically capable of such a construction. Even if the sentence were ambiguous, however, it is well-established that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and

This interpretation accords with the general purpose of the juvenile justice system, which has historically been one of rehabilitation. See generally Application of Gault, 387 U.S. 1 (1967) (discussing the history of the juvenile justice movement in the United States). "The main purpose of the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. §§ 5031-42, is to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." United States v. Bilbo, 19 F.3d 912, 915 (5th Cir. 1994) (internal citation and quotation marks omitted). See also United States v. Juvenile Male No. 1, 86 F.3d 1314, 1320 (4th Cir. 1996) ("Except for that limited group of crimes to which mandatory transfer to adult status applies, the focus of the juvenile statutes is still on rehabilitation within the state systems."). The purpose of this transfer provision is clearly to differentiate between certain ages and certain crimes, and the combination of the two, in determining which juveniles must be treated as juveniles and which may be treated as adults. It is logical to read the text as permitting all juveniles over age fifteen who have committed certain serious crimes to be eligible for a transfer hearing, but limiting the eligibility of younger juveniles for transfer hearings based on the type of crime committed and the severity of the offense. Certain offenses, the first set, are considered severe enough that any alleged commission makes a juvenile between the ages of thirteen and fifteen eligible for a transfer hearing. The second set are of less severity, and therefore only make a juvenile between the ages of thirteen and fifteen eligible for a transfer hearing if they are aggravated, so to speak, by the additional element of possession of a firearm during the alleged commission.

---

definite." United States v. Bass, 404 U.S. 336, 347 (1971) (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-222 (1952)).

The charges against D.W. for the carjackings allegedly committed on July 21, 2006, when he was fourteen, do not fall within either of the groups of enumerated statutes. D.W. is not alleged to have committed either (1) offenses that would be crimes of violence under 18 U.S.C. § 113(a-c) (assault within federal maritime or territorial jurisdiction), § 1111 (murder), § 1113 (attempted murder or manslaughter within federal maritime or territorial jurisdiction); or (2) possession of a firearm during offenses that would be crimes of violence under § 2111 (robbery or burglary in federal maritime or territorial jurisdiction), § 2113 (bank robbery), § 2241(a) (aggravated sexual abuse in federal maritime or territorial jurisdiction) or § 2241(c) (sexual abuse of a child in federal maritime or territorial jurisdiction or after crossing state lines). It thus does not appear that D.W. is eligible for a transfer hearing for the charges arising from the alleged carjackings committed on July 21, 2006.

This issue was not raised by the parties, but we will nevertheless address certain claims sua sponte in some circumstances:

> We may raise an issue sua sponte "even though it is not assigned or specified," when "plain error is apparent." United States v. Pineda-Ortuno, 952 F.2d 98, 105 (5th Cir. 1992) (citing Silber v. United States, 370 U.S. 717, 718, 82 S. Ct. 1287, 1288, 8 L. Ed. 2d 798 (1962) and United States v. Adams, 634 F.2d 830, 836 (5th Cir. Unit A January 1981)). . . . We review an issue not raised below only for plain error, see id., which is defined as "(1) an error; (2) that is clear or plain; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Vasquez, 216 F.3d 456, 459 (5th Cir.2000).

United States v. Gonzalez, 259 F.3d 355, 359 (5th Cir. 2001). The error in this case is plain on the face of the statute. A juvenile between the ages of thirteen and fifteen may not be subject to a hearing concerning transfer to adult status unless he or she has allegedly committed one of the offenses as enumerated in the statute. D.W. has not been charged with an offense that brings him within

8

the ambit of the statute. This error affects D.W.'s substantial rights. Although a transfer hearing is not a determination on the merits of the charge, it subjects the defendant to the possibility of criminal conviction as an adult and the substantially more severe penalties that accrue to such conviction, while also increasing the risk that he will not be provided with rehabilitative services in an appropriate juvenile facility. Courts and scholars have enumerated the many disadvantages of adult prosecution to a juvenile. See, e.g., D. Ross Martin, Conspiratorial Children? The Intersection of the Federal Juvenile Delinquency Act and Federal Conspiracy Law, 74 B.U. L. Rev. 859, 865 n.34 (1994) ("Courts have noted that after transfer, a federal district court takes full adult jurisdiction over the case, e.g., In re Sealed Case (Juvenile Transfer), 893 F.2d 363, 369 (D.C. Cir. 1990), that a transfer hearing can result in greatly increased punishment while never inquiring into the specifics of the alleged offense, e.g., id., and that a transferred juvenile loses rights to separate pretrial incarceration, see United States v. Baker, 10 F.3d 1374, 1396-97 (9th Cir. 1993), cert. denied, 113 U.S. 330 (1994), as well as protection against pretrial publicity that the accused cannot regain, see Sealed Case, 893 F.2d at 366-67."). Finally, it "seriously affects the fairness, integrity or public reputation of judicial proceedings" to prosecute a juvenile in a manner that Congress has not authorized. D.W. therefore may not be prosecuted as an adult for any charges arising from the July 21, 2006 carjackings, which transpired before his fifteenth birthday.

D.W. was however, eligible for transfer to adult prosecution on the charges arising from the alleged carjacking on March 17, 2007, because he turned fifteen on November 4th, 2006. He was eligible for transfer to adult prosecution for this second set of charges so long as he was alleged to have committed "an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence." Carjacking is "always and without exception a crime of

violence." United States v. Frye, 489 F.3d 201, 208-09 (5th Cir. 2007) (internal citation and quotation marks omitted). Conspiracy to commit a crime of violence also qualifies as a crime of violence. See United States v. Elder, 88 F.3d 127, 129 (2d Cir. 1996); see also United States v. Greer, 939 F.2d 1076, 1099 (5th Cir. 1991). D.W. was therefore eligible for transfer to adult prosecution for the charges arising from the March 17, 2007 alleged carjacking.

Having determined that D.W. was ineligible for transfer to adult status on the first set of charges, we still must consider the merits of the district court's decision ordering transfer for D.W. as to the charges arising out of the March 17, 2007 carjackings and ordering transfer for J.S. as to all charges. This court reviews factual findings made by a district court considering a motion to transfer a juvenile to adult status for clear error, and reviews the overall decision to grant or deny the transfer motion for abuse of discretion. United States v. Juvenile No. 1, 118 F.3d 298, 307 (5th Cir. 1997). A finding of fact is clearly erroneous when "although there is evidence to support it, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (internal citation and quotation marks omitted).

There is a presumption in favor of juvenile status and it is therefore the Government's burden to prove, by a preponderance of the evidence, that the transfer is in the best interest of justice. United States v. Juvenile Male No. 1, 47 F.3d 68, 71 (2d Cir. 1995). In evaluating such a motion, the district court must consider six factors outlined in § 5032, namely: (1) the age and social background of the juvenile, (2) the nature of the alleged offense, (3) the extent and nature of the juvenile's prior delinquency record, (4) the juvenile's present intellectual development and psychological maturity, (5) the nature of past treatment efforts and the juvenile's response to such efforts, and (6) the availability of programs designed to treat the juvenile's behavioral problems. §

5032; see also Juvenile No. 1, 118 F.3d at 307. In considering the transfer, the district court must consider all six factors but is not required to weigh them equally. Id. This circuit has made clear that the seriousness of the offense in particular may be given more weight than other factors "in determining whether there is a realistic chance of rehabilitation and hence whether transfer is appropriate." Id. (internal citation and quotation marks omitted); see also Juvenile Male No. 1, 47 F.3d at 71. Overall, the decision as to whether a transfer is in the best interest of justice is entrusted to the sound discretion of the district court. Doe, 871 F.2d at 1252. We treat the district court's decision as to each defendant in turn, beginning with D.W. and reviewing the findings made by the district court under each factor required by the statute.

As to the first factor, the evidence presented at D.W.'s transfer hearing showed that he experienced significant violence within his family and was frequently suspended from school for fighting and other behavioral problems. He had a history of gang membership, had escaped from secure custody twice, engaged in heavy drug use, had symptoms of mental illness, and had an IQ of 58, which qualified him as mentally retarded. D.W. had multiple extrinsic factors for future violence, including exposure to gangs, the availability of drugs and firearms in his community, family instability, and exposure to family substance abuse and violence. D.W. had a history of cruelty to animals, starting fire, and selling drugs. D.W.'s own expert testified that he presented a "moderate risk" for future dangerous behavior. As to the second factor, the nature of the alleged offenses is self-evidently serious; as to the third, the district court found that there was no evidence that D.W. had a prior juvenile delinquency record. As to the fourth factor, the district court reviewed a competency screening and determined that D.W. knew he had defense counsel to assist him and would be capable of understanding his legal rights if appropriately counseled by his attorney. The district court found that D.W. suffered from Conduct Disorder

11

(characterized by rule-breaking and hostility to authority) and Post-Traumatic Stress Disorder ("PTSD"), and that he had anti-social traits, including a propensity towards extreme violence and a lack of remorse for his actions. As to the fifth factor, the district court found that D.W. had not historically consistently received the kind of treatment that he needed for his psychological problems and intellectual limitations, and that while he did respond positively to treatment while receiving it, he reverted to his old behavior as soon as treatment stopped. Finally, as to the sixth factor, the district court accepted the testimony of the Government's expert that Conduct Disorder is difficult to treat, and of D.W.'s own expert that he was in the middle to low range for treatment amenability.

The district court, evaluating all of the evidence, found that the interest of justice weighed in favor of transferring D.W. to adult status. On appeal D.W. argues that the district court gave insufficient weight to evidence of D.W.'s mental retardation and his response to rehabilitative treatment while in custody. The fact that D.W.'s IQ is 58, and he is therefore mentally retarded, is certainly a factor that a district court should take into account. The district court did so in this case, however, noting that although D.W.'s IQ was 58, the court was convinced that D.W. was able to instigate criminal activity and was competent to stand trial.[3] The district court also relied on the report by D.W.'s own expert, which indicated that while D.W. did not currently understand all of his legal rights he was capable of doing so with appropriate attention from his counsel. In addition, as part of the same factor, the district court found that D.W. had Conduct Disorder and anti-social personality traits, as well as longer-standing patterns of behavior problems and difficulty with authority. These findings, and the district court's finding that they weighed in favor of transfer,

---

[3] D.W. also challenges the district court's ruling on his competency to stand trial – this challenge is addressed below.

are not clearly erroneous. While D.W. had improved since being interred at the Florida Parish Detention Center following his arrest, the district court found that similar past improvements had evaporated as soon as D.W. was released from custody and that D.W.'s particular psychological disorders were difficult to treat and that D.W. as an individual was not particularly amenable to treatment and improvement. This court has upheld similar reasoning on appeal before. See Doe, 871 F.2d at 1255. In sum, none of these findings were clearly erroneous. The district court specifically stated that, as our precedent allows, it was weighing the circumstances of the alleged crime more heavily than the other factors, see Juvenile No. 1, 118 F.3d at 307, and taken in conjunction with its factual findings, the district court did not abuse its discretion in finding that the interest of justice favored transferring D.W. to adult status.

The district court similarly did not err in transferring J.S. to adult status. As to the first factor, the district court found that J.S. had endured traumatic circumstances growing up, including almost daily gunfire in his neighborhood, the drowning death of his sister when he was 12, being shot in the arm once himself, and psychotic mental illness among his family members. The district court found that J.S.'s intrinsic and extrinsic violence risk assessment factors indicated a high risk of future violence; J.S. had a history of violent behavior, including while incarcerated; a history of using firearms; a history of heavy drug use; a history of failing to respond positively to institutionalization or discipline within the educational system; low IQ; symptoms of mental illness; a history of anger management problems; residence in a violent community with exposure to gangs; a high availability of drugs and firearms in his community; and family instability and lack of family support. As to the second factor, the nature of the alleged offenses is self-evidently serious; as to the third, the district court found that there was no evidence that J.S. had a prior juvenile delinquency record. As to the fourth factor, the district court found that J.S. had accumulated 20-30

lifetime suspensions from school. Although J.S. was generally well-behaved and making progress at the detention center, J.S. had attacked another inmate and threatened staff on at least one occasion. The district court found that J.S. was suffering from Conduct Disorder, PTSD, and a learning disability, and had an IQ of 77, which was borderline mentally retarded or in the "lowest range of normal." The district court also found that while J.S. was responding well to treatment for his PTSD at the detention facility, J.S.'s expert had based too much of her evaluation on his improvement in reading comprehension, which was not a sufficiently broad basis for an assessment of psychological improvement, particularly since J.S. had failed to respond to intervention attempts previously made in other institutional settings.

The district court, evaluating all of the evidence, found that the interest of justice weighed in favor of transferring J.S. to adult status. J.S. argues on appeal that the district court did not give sufficient weight to J.S.'s potential for rehabilitation. While the district court did seem to misinterpret or minimize the consistent testimony from both the Government's expert and J.S.'s expert that J.S. was, for the first time, receiving appropriate mental health care and educational support and was responding positively to those interventions, the district court did not abuse its discretion in nevertheless finding that the interest of justice weighed in favor of transfer. The district court, as it was allowed, prioritized the severity of the alleged crime in its analysis, and relied upon J.S.'s extensive risk factors for future violence. Given these factors, transferring J.S. to adult status was not an abuse of discretion.

There remain two final issues to address. First, D.W. argues on appeal that the district court erred in finding him competent to stand trial. We will examine the basis of our own jurisdiction when necessary, even when the issue is not raised by the parties. Mosley v. Cozby, 813 F.2d 659, 660 (5th Cir. 1987). We have jurisdiction only over appeals from final orders or particular classes of

interlocutory orders. See Dardar v. Lafourche Realty Co., 849 F.2d 955, 957 (5th Cir. 1998); Save the Bay Inc. v. United States Army, 639 F.2d 1100, 1102 (5th Cir. 1981). The district court's ruling that D.W. is competent to stand trial is not a final order; it does not end the litigation or leave nothing to do but execute the judgment. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 467 (1978). The district court has not certified the order as a final judgment under Rule 54(b) or certified it for appeal under § 1292(b). The competency ruling is not covered by the collateral order doctrine. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949). Thus the district court's finding that D.W. is competent to stand trial is not an appealable order prior to the final judgment of the case. See United States v. Eike, 66 F.3d 322 (5th Cir. 1995) (unpublished) (dismissing appeal of ruling that defendant was competent to stand trial for lack of jurisdiction); accord United States v. Rochelle, 315 F. App'x 445 (4th Cir. 2009). Given that D.W. is a juvenile with an IQ of 58 his competency is certainly a serious concern, but we do not have jurisdiction over this claim.

Second, J.S. argues that the district court erred in crediting the testimony of the Government's expert, Dr. Kaliebe, over the testimony of J.S.'s expert, Dr. Willis. We review a district court's findings of fact, including those made on the basis of credibility, for clear error. United States v. Bell, 871 F.2d 1248, 1255 (5th Cir. 1989). J.S. has failed to provide any legal authority to support his allegation, nor has he pointed to any particular parts of Dr. Kaliebe's testimony that evidence a lack of credibility. J.S. has failed to adequately brief this argument and it is therefore waived. United States v. Martinez, 263 F.3d 436, 438 (5th Cir. 2001)

## III. CONCLUSION

For these reasons we REVERSE the district court's order transferring D.W. to adult prosecution for the charges arising from the July 21, 2006 carjackings. The district court's judgment is otherwise AFFIRMED, and the case is remanded for further proceedings consistent with this opinion.