**UNITED STATES of America,**
**Plaintiff,**

v.

**Y.C.T. MALE JUVENILE, Defendant.**

**Criminal No. 13–235 (FAB).**

United States District Court,
D. Puerto Rico.

Signed Nov. 22, 2013.

**524**

Kelly Zenon–Matos, Marcela C. Mateo, Victor O. Acevedo–Hernandez, United States Attorney's Office, San Juan, PR, for Plaintiff.

Hector E. Guzman–Silva, Patricia Garrity–Walkmaster, Hector L. Ramos–Vega, Federal Public Defender's Office, Hato Rey, PR, for Defendant.

### MEMORANDUM AND ORDER

BESOSA, District Judge.

Before the Court is Magistrate Judge Bruce J. McGiverin's Report and Recommendation ("R & R"), (Docket No. 91), concerning the United States's motion to transfer, (Docket No. 15), its memorandum in support of transfer, (Docket No. 86), and Y.C.T.'s opposition to the R & R. (Docket No. 85). On October 18, 2013, the magistrate judge found that this case meets the criteria for permissive transfer of the juvenile Y.C.T. to adult status for prosecution and recommended that the United States's motion for transfer be granted. (Docket No. 91 at p. 13.) On

November 4, 2013, Y.C.T. timely[1] filed his objections to the R & R. (Docket No. 92.)

Having considered the record of the transfer proceedings and the parties' filings, the Court **ADOPTS** the findings of the magistrate judge, **GRANTS** the United States' motion for transfer for the reasons set forth below and **ORDERS** defendant minor Y.C.T. transferred to adult status for prosecution.

## I. DISCUSSION

### A. Standard of Review

A district court may refer a pending dispositive motion in a criminal case to a magistrate judge for a report and recommendation. See 28 U.S.C. § 636(b)(1)(B); Fed.R.Cr.P. 59(b); Local Rule 159(a). Any party adversely affected by the report and recommendation may file written objections within fourteen days of being served with the magistrate judge's report. See 28 U.S.C. § 636(b)(1); Fed.R.Crim.P. 59(b). A party who files a timely objection is entitled to a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). Failure to comply with this rule precludes further review. See *Davet v. Maccarone*, 973 F.2d 22, 30–31 (1st Cir.1992). In conducting its review, the Court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(a), (b)(1); *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir.1985); *Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.*, 286 F.Supp.2d 144, 146 (D.P.R.2003). Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object. See *Hernandez–Mejias v. Gen. Elec.*, 428

1. See Docket No. 91 (setting deadline for objections at November 4, 2013).

F.Supp.2d 4, 6 (D.P.R.2005) (citing *LaCedra v. Donald W. Wyatt Det. Facility*, 334 F.Supp.2d 114, 125–126 (D.R.I.2004)).

## B. Transfer Criteria

■ The Federal Juvenile Delinquency Act ("the Act"), 18 U.S.C. § 5031 *et seq.*, is tasked with removing "juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *United States v. Female Juvenile, A.F.S.*, 377 F.3d 27, 32–33 (1st Cir.2004) (internal quotation omitted). Transfer hearings do not resolve questions of substantive guilt or innocence, but rather address "whether a defendant should be exempted from criminal prosecution because he falls within a category of persons who, in the eyes of the law, are not viewed as fully responsible for their acts." *O'Brien v. Marshall*, 453 F.3d 13, 17 (1st Cir.2006) (quoting *United States v. A.R.*, 38 F.3d 699, 703 (3d Cir.1994)). A district court making a transfer determination must balance these interests against "the need to protect the public from violent and dangerous individuals." *United States v. Male Juvenile E.L.C.*, 396 F.3d 458, 461 (1st Cir.2005) (internal citation omitted). Because there is a presumption favoring juvenile adjudication, the government carries the burden of establishing by a preponderance of the evidence that transfer is warranted. *A.R.*, 38 F.3d at 703 & 706.

■ Upon government motion, a juvenile transfer is proper where: (1) the juvenile is fifteen years old or older, (2) he or she is charged with committing an act that if committed by an adult would be a felony crime of violence or one of the enumerated offenses, and (3) the Court finds after a hearing that transfer is in the interest of justice. 18 U.S.C. § 5032. Courts must consider and make findings regarding the following six factors in assessing whether a juvenile transfer is in the interest of justice: (1) the juvenile's age and social background; (2) the nature of the alleged offense; (3) the extent and nature of the juvenile's prior delinquency record; (4) the juvenile's current intellectual development and psychological maturity; (5) the nature of past treatment efforts and the juvenile's response to those efforts; and (6) the availability of programs designed to treat the juvenile's behavioral problems. *Id.*

■ To support a transfer determination, "the district court need not [ ] find that a majority of factors weigh in favor of the prevailing party, as 'it is not required to give equal weight to each factor but 'may balance them as it deems appropriate.'" *Male Juvenile E.L.C.*, 396 F.3d at 461 (quoting *United States v. Leon D.M.*, 132 F.3d 583, 589 (10th Cir.1997)).

Because minor Y.C.T. objects to the magistrate judge's findings regarding each of the six factors, the Court addresses each factor in turn.

### 1. Age and Social Background

■ The proximity of a juvenile's age to eighteen impacts the transfer analysis. *See United States v. A.R.*, 203 F.3d 955, 961 (6th Cir.2000) (agreeing that "the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult.") In addition to age at the time of the offense, a juvenile's age at the time of the transfer proceeding should be considered because it is relevant to "whether juvenile-type rehabilitation programs would be more appropriate for the individual ...." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir.1995). At the time the alleged offense was committed, minor Y.C.T. was seventeen years and ten months old. By the time of the transfer hearing, he was eighteen.

■ Factors relevant to social background include supportiveness of family environment, strength of family relation-

ships, and conduciveness to supervision. *United States v. Juvenile K.J.C.*, 976 F.Supp. 1219, 1225 (N.D.Iowa 1997). The absence of a strong family environment weighs against a juvenile's likelihood for rehabilitative success. *See United States v. Juvenile No. 1*, 118 F.3d 298, 308 (5th Cir.1997).

Y.C.T.'s parents, who are separated, and siblings reside in Florida. (Tr. 26, 69, 146.) Both parents have been convicted of controlled substances violations. (Tr. 140–1; Docket No. 76–1 at p. 3.) Y.C.T.'s father is a paraplegic due to a work accident that occurred prior to Y.C.T.'s birth. (Tr. 118.) When Y.C.T. was nine years old, his father left his family in Florida to care for his ailing mother in Puerto Rico without court permission. As a consequence, his family lost their eligibility for social security benefits. (Tr. 141.) After his father left, Y.C.T. began to act out and have problems in school; he left school after the sixth grade at the age of thirteen. (Tr. 155.) Prior to leaving school, Y.C.T. was in special education classes for the first, second, fifth, and sixth grades. (Tr. 116; Docket No. 76–1 at p. 3.) After Y.C.T. was "attacked and brutally beaten" by members of a gang with which he had refused to affiliate, Y.C.T. left school and the family moved to Puerto Rico in 2008. (Tr. 139.) Once Y.C.T.'s father returned from Puerto Rico, he was arrested and incarcerated for violating his probation conditions. (Tr. 140–41.) His mother is trained as a nurse and does not currently work due to her probationary status. (Tr. 141.)

At the time the alleged offense was committed, Y.C.T. lived in Puerto Rico with his seventeen-year-old consensual partner, with whom he had been together for a year and a half and who was pregnant with his child. (Tr. 70.) Y.C.T.'s partner also has a one-year-old son that refers to him as "father." (Tr. 140.) The couple planned to live in Florida as a family unit.

*Id.* Y.C.T. was being supervised by his twenty-five year-old female cousin. (Tr. 139.) Dr. Carol Romey, who evaluated Y.C.T., described this living situation as "children raising children" and "not a sign of maturity." (Tr. 140.)

In light of the above facts, the Court finds that this factor weighs in favor of transfer. Y.C.T. is currently over eighteen, and was just two months shy of eighteen when the alleged offense occurred. While the Court takes Y.C.T.'s troubled social background into account as a possible mitigating factor, his current lack of a stable home environment to return to lessens his prospects of a successful rehabilitation in the juvenile system.

**2. Nature of the Alleged Offense**

For the purposes of a transfer determination, the Court "may assume the truth of the government's allegations regarding the defendant's commission of the crime." *United States v. McQuade Q.*, 403 F.3d 717, 718 n. 1 (10th Cir.2005) (internal quotation omitted). The Court may also consider evidence regarding the specifics of the offense. *See In re Sealed Case (Juvenile Transfer)*, 893 F.2d 363, 370 (D.C.Cir.1990). Consideration of this factor includes assessing "the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms." 18 U.S.C. § 5032. A finding of those circumstances weighs in favor of transfer. *Id.* Many courts have granted transfer based on the violent nature of the offense itself in cases involving carjacking or armed robbery, such as this case. *See United States v. A.C.P.*, No. 04–159, 2005 WL 1367396, at *3 (D.P.R. Apr. 28, 2005) (Gelpi, M.J.) (compiling published cases where transfer based on the violent nature of the offense was warranted).

Y.C.T. was charged with carjacking resulting in serious bodily injury, and aiding and abetting others who brandished a firearm during and in relation to a crime of violence. (Docket Nos. 3, 12, 13.) The nature of the offense is a serious crime of violence as certified by the United States Attorney. (Docket No. 4.) Testimony by Special Agent Gonzalez at the transfer hearing indicated that Y.C.T. participated actively in the commission of the crime, used a toy gun to intimidate the victims, drove the carjacked vehicle, demanded money from the victims, assaulted the male victim inflicting a wound, threatened to kill both victims, and sexually assaulted the female victim. (Tr. 11–23.) [2]

Y.C.T.'s actions as alleged indicate a prolonged episode of reckless and violent behavior cut short by police intervention. Thus, the Court finds that this factor weighs heavily in favor of transfer.

### 3. Nature and Extent of Juvenile Delinquency Record

■ The lack of a prior juvenile delinquency record weighs against transfer and in favor of juvenile treatment because it indicates an increased likelihood of rehabilitation by the time the accused reaches twenty-one. *See United States v. M.L.,* 811 F.Supp. 491, 495 (C.D.Cal.1992). Juvenile delinquency records containing more serious and frequent delinquency episodes, on the other hand, can weigh in favor of transfer. *See United States v. M.H.,* 901 F.Supp. 1211, 1215 (E.D.Tex. 1995).

Y.C.T. does not have a significant juvenile delinquency record. Between the ages of ten and twelve in Florida, Y.C.T. received two misdemeanor convictions, and several additional charges for conduct related to fist fights and resisting officers.

(Docket No. 86–1.) He was convicted of criminal mischief in Florida for breaking a window in a neighbor's house when he was nine years old and sentenced to six months of probation, but his records do not indicate any results or follow up of the probation. (*See* Docket No. 86–1.) Y.C.T. had no charges or convictions between the ages of twelve and seventeen, when he was arrested in this case. S.A. Gonzalez testified, however, that there is an outstanding arrest warrant for assault charges in Florida. (Tr. 27.)

The Court does not find that this factor weighs in either direction. Y.C.T. does have a record, but it is not so extensive to suggest incorrigibility.

### 4. Juvenile's Present Intellectual Development and Psychological Maturity

■ Transfer is appropriate for a juvenile with high intellectual development and psychological maturity, because he or she is more responsible for his or her conduct. *United States v. J.D.,* 525 F.Supp. 101, 104 (S.D.N.Y.1981).

Y.C.T. was evaluated by two psychologists who performed a series of psychological and neuropsychological assessments. The first evaluation was performed by Dr. Jaime Grodzinski, who found Y.C.T. to have average intellectual development and psychological maturity, as well as an average IQ. (Tr. 76, 83.) Y.C.T.'s evaluation revealed deficits in his psychomotor speeds and verbal abilities, which Dr. Grodzinski attributed to a lack of formal education. (Tr. 75–9.) Dr. Grodzinski indicated that these deficits may improve with structured educational training because Y.C.T. is cooperative, and has good insight and a good learning ability. (Tr. 80–1.) Dr. Grodzin-

---

**2.** Y.C.T. challenged S.A. Gonzalez's acquisition of this information. (Tr. 33–35.) Because the Court does not consider the strength of the government's evidence at the

transfer stage, this challenge is irrelevant to the transfer determination. *In re Sealed Case (Juvenile Transfer),* 893 F.2d at 370.

ski also found that Y.C.T. had symptoms consistent with mild to moderate depression and anxiety, but concluded that he did not suffer from any mental health diagnoses or personality disorders. (Tr. 81–2.)

Dr. Romey interviewed Y.C.T. and his mother to obtain background information regarding Y.C.T.'s schooling, interventions, and family dynamics, in addition to conducting a psychological profile. (Tr. 115.) Dr. Romey testified that Y.C.T. is "type-two" bilingual, meaning that he is not totally fluent in either English or Spanish, which contributes to his verbal deficits. (Tr. 122.) Dr. Romey found Y.C.T. to be "very young linguistically, verbally, and very young educationally," as well as a "home oriented, family oriented, very sheltered, a little bit over socialized maybe, and [a] very protected kid." (Tr. 143.) She concluded that he has the intellectual ability or potential to benefit from treatment, and described him as "the kind of young man that a transfer hearing is designed to hold onto, and keep [ ] in the juvenile system, where people skilled in adolescents . . . can deal with him and help him mature." (Tr. 134.) Within the detention center, Y.C.T. is a peacemaker who follows the rules. (Tr. 138.)

The Court finds that this factor weighs against transfer. Y.C.T.'s adolescent psychological and developmental capacities, as well as his educational and verbal deficits, indicate a young man who is not fully developed and would respond to structured treatment and programming. As an adolescent, his neuropsychological capacities have not fully matured, rendering him less capable of rational decision-making and impulse control than developed adults.

### 5. Nature of Past Treatment Efforts and the Juvenile's Response to Those Efforts

Prior to his arrest in this case, Y.C.T. never received any significant professional or institutional treatment. As mentioned above, he received a probationary sentence at the age of ten, but the record does not indicate any follow up or progress monitoring regarding that sentence. Additionally, Dr. Romey's report indicates that Y.C.T. was diagnosed with Attention Deficit Hyperactivity Disorder as a child and received monthly psychological treatment for one year. (Docket No. 76–1 at p. 3.) Again, the record does not indicate how Y.C.T. responded to this treatment.

Since his arrest in this case, Y.C.T. has been detained at the Bayamon Juvenile Detention Center where according to social worker Dania Santiago Castillo, he behaves well, is respectful and cooperative, follows the rules, and receives special privileges. (Tr. 89–90.) Ms. Santiago opined that if Y.C.T. participated in a structured rehabilitative process that provided him with direction and tools, he would subsequently do well in the free community. (Tr. 93.) Efrain Fanador, the supervisor of social workers at the Bayamon Juvenile Detention Center, expressed similar opinions regarding Y.C.T.'s conduct at the institution and his potential to develop. (Tr. 104–6.)

The Court finds that this factor weighs against transfer. The little information available regarding this factor suggests that Y.C.T. functions well in a structured juvenile facility, and could benefit from juvenile treatment.

### 6. Availability of Programs Designed to Treat Juvenile's Behavioral Problems

The Court must consider the availability of programs for similarly-aged juveniles, how the juvenile in this case would fit into the program, and how long he is to remain detained. *Nelson*, 68 F.3d at 590–91. The facility must provide the juvenile with his basic necessities, plus counseling, education, training, and medical care, including any necessary psychiat-

ric or psychological treatment. *United States v. Patrick V.*, 359 F.3d 3, 12 (1st Cir.2004) (citing 18 U.S.C. § 5039).

Mr. Daryl Cash, who oversees federal juvenile cases in the Federal Bureau of Prisons Community Corrections Office in Utah, testified that juvenile and adult facilities offer similar programs addressing "anger management, life skills, thinking errors and, if appropriate, sex offender treatment." (Tr. 50.) They differ in that treatment and programming are mandatory at juvenile facilities but are optional at adult facilities. (Tr. 53–4.) Additionally, the staff-to-inmate ratio is more favorable in juvenile (one to eight) than adult facilities (one to 250). *Id.* Adult facilities offer a greater variety of vocational training programs, while juvenile programs are more limited and participation is earned through good behavior. (Tr. 51, 60.) Dr. Romey testified about the benefits of placement in a juvenile center for someone with Y.C.T.'s psychological profile, noting that the lower staff-to-inmate ratio and therapeutic community are essential for adolescent development and rehabilitation. (Tr. 142–5.) She opined that Y.C.T.'s treatment needs "are best served at the juvenile level with academic studies, sports and treatment programs designed for late adolescence." (Docket No. 76–1 at p. 11.)

In terms of the amount of time Y.C.T. could be detained, the Court notes that the United States and the Magistrate Judge incorrectly concluded that the maximum term of detention that could be imposed on Y.C.T. if adjudicated delinquent in the juvenile justice system would be three years—until he reached his twenty-first birthday. (Docket Nos. 86 at p. 7; 91 at p.

13.) This consideration factored into the Magistrate Judge's analysis and determination that the juvenile system would not adequately provide rehabilitation for Y.C.T. Pursuant to the Act's sentencing provisions in section 5037, however, the juvenile's age at the time of disposition governs. *See United States v. K.R.A.*, 337 F.3d 970, 977 (8th Cir.2003) (concluding "based on the plain meaning of the statutory language . . . that the juvenile's age at the time of the imposition of official detention is the correct age to use when determining the maximum term of official detention under § 5037(c))." Thus, Y.C.T.'s maximum term of official detention would be governed by section 5037(c)(2), which would in this case—a disposition of a juvenile between the ages of eighteen and twenty—one for the equivalent of a Class A, B, or C felony—provide for the lesser of five years or "the maximum of the guideline range . . . applicable to an otherwise similarly situated adult defendant." 18 U.S.C. § 5037(c)(2).[3]

Although juvenile detention facility may be best positioned to provide the educational and therapeutic resources that could benefit Y.C.T., Dr. Cash's testimony about the availability and variety of vocational training in adult programs, though optional, could also benefit Y.C.T. On balance, therefore, this factor does not weigh either for or against transfer.

## C. Evaluation of the Section 5032 Factors

 Section 5032 establishes three criteria that must be met before a permissive transfer of juvenile to adult prosecution

---

**3.** At the transfer hearing and in its objections to the R & R, defense counsel argued that Y.C.T. could be detained until the age of 25. (Docket No. 92 at p. 3; Tr. 135.) Defense counsel does not cite any authority for this proposition, and to the extent it is based on the provisions of 18 U.S.C. § 5037, it would only apply for a juvenile whose *probation* disposition took place after the age of twenty-one, inapplicable here. *See* 18 U.S.C. 5037(b)(2)(B), (d). Regardless, this consideration, if true, would not impact the Court's transfer determination.

can occur. The first and second criteria are satisfied here. Y.C.T. was over fifteen years of age at the time of the commission of the alleged offense (he was seventeen), and he is charged with committing what would be a violent felony if committed by an adult. Determination of the third criteria, whether transfer is in the interest of justice, requires the Court to assess the factors listed above.

Having considered and weighed the section 5032 factors, the Court makes the following determinations. Two factors weigh in favor of maintaining juvenile status, two factors weigh in favor of transfer and two factors do not weigh in either direction. Y.C.T.'s age—as very close to eighteen at the time of the offense and eighteen at the time of the transfer hearing—and social background weigh in favor of treating him as an adult. The nature and circumstances of the alleged offense weigh very heavily in favor of a transfer to adult status. The Court agrees with the United States that the violent and serious nature of the charged offenses warrants significant weight. *See United States v. Parker*, 956 F.2d 169, 172 (8th Cir.1992) (finding that transfer of juvenile based on gravity of crime involved was not an abuse of discretion); *A.R.*, 38 F.3d at 705 (finding that a court is justified weighing the seriousness of the crime more heavily). The Court does not grant weight either way to Y.C.T.'s prior juvenile delinquency record or the availability of treatment programs. In its ultimate balancing, the Court determines that the United States has demonstrated by a preponderance of the evidence that the interest of justice requires a transfer of Y.C.T. to adult prosecution.

## II. CONCLUSION

The Court, having made an independent examination of the entire record pertinent to the transfer proceeding in this case and independent findings regarding the section 5032 transfer criteria, **ADOPTS** the magistrate judge's recommendations and **GRANTS** the United States's motion to transfer Y.C.T. to adult status.

**IT IS SO ORDERED.**