*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0061P (6th Cir.)
File Name: 00a0061p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

A.R.,
*Defendant-Appellant.*



No. 99-5484

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 99-10011—James D. Todd, District Judge.

Argued: October 29, 1999

Decided and Filed: February 17, 2000

Before: JONES, BOGGS, and COLE, Circuit Judges.

---

### COUNSEL

**ARGUED:** David W. Camp, DOWDEN, ZDANCEWICZ &
CAMP, Jackson, Tennessee, for Appellant. John T. Fowlkes,
ASSISTANT UNITED STATES ATTORNEY, Memphis,
Tennessee, for Appellee. **ON BRIEF:** David W. Camp,
DOWDEN, ZDANCEWICZ & CAMP, Jackson, Tennessee,
for Appellant. John T. Fowlkes, ASSISTANT UNITED
STATES ATTORNEY, Memphis, Tennessee, for Appellee.

1

—————————————

**OPINION**

—————————————

NATHANIEL R. JONES, Circuit Judge.    Defendant-Appellant A.R. appeals the district court's order for transfer to adult criminal prosecution for crimes A.R. committed when he was 17 and 18 years old.  A.R. also challenges the court's dismissal of his motion to set aside the order of transfer on speedy trial grounds.  Because the district court did not abuse its discretion in ordering A.R.'s transfer, we **AFFIRM**.

**I.**

**A. Procedural History**

On February 2, 1999, the United States filed an Information against A.R. which charged him with a number of criminal actions: conspiracy; armed robberies of a Little Caesar's Pizza Parlor and Po Folks Restaurant on October 18, 1997 and in November 1997, respectively; and two drug offenses in November 1997 and in March 1998, the latter occurring after A.R.'s 18th birthday.  The Government also filed motions to detain A.R. pending trial and to transfer his proceedings to adult criminal prosecution.  A.R. was arrested and taken into custody on February 3, 1999.  On February 18, the district court issued an order to detain A.R. without bond.  Fifty-five days after his initial detention, on March 30, the district court held a transfer hearing.  There, the court found for the Government, ordering A.R.'s transfer to adult criminal prosecution on April 2.  On April 5, the court denied A.R.'s motion to set aside the order of transfer.  A.R. filed a notice of appeal on April 7, 1999.

*See, e.g.*, *United States v. Wong*, 40 F.3d 1347, 1371 (2d Cir. 1994).  More importantly, they held that the time between the government's motion to transfer and the court's disposition of that motion was tolled as part of § 5036's "interest of justice" exception to the thirty-day deadline.  *See id*; *United States v. Romulus*, 949 F.2d 713, 716 (4th Cir. 1991).  This is consistent with this and other circuits' willingness to grant such exceptions liberally.  *See, e.g.*, *One Juvenile Male*, 939 F.2d 321, 324 (6th Cir. 1991) (concluding that two continuances which delayed the trial beyond the thirty-day deadline fell within the "interest of justice exception").  And contrary to A.R.'s suggestion, there is no requirement that a court must make its transfer determination within thirty days of the motion's filing.  *Cf. Wong*, 40 F.3d at 1371 (excluding from the thirty-day requirement the forty days which elapsed between the filing of the transfer motion and the court's disposition).  In sum, we see no reason to depart from the Second and Fourth Circuit approaches, which comport with the statute's express exception to the thirty-day requirement.

**IV.**

On appeal, A.R. has essentially sought to re-argue the case that he made and lost before the district court.  A.R. has made no showing that the court abused its discretion.  He has also failed to show a speedy trial violation.  We therefore **AFFIRM** the district court's order of transfer.

to wait until after trial and a final judgment to appeal the claim, the adult trial would have already sacrificed the "legal and practical benefits of being tried as a juvenile." *Angelo D.*, 88 F.3d at 858 (quoting *United States v. Doe*, 49 F.3d 859, 865 (2d Cir. 1995)). These lost benefits include "pretrial detention in a foster home or community-based facility near the juvenile's home instead of adult prison . . . , and the sealing of records and the withholding of the juvenile's name and picture from the media." *Id.* Just as in the case of other substantive and procedural claims, if the speedy trial violation would have led to dismissal of the case, those "benefits" would be sacrificed by requiring an adult criminal trial before allowing an appeal for the violation. This "loss" satisfies the third prong of the collateral order test, and distinguishes the juvenile context from non-juvenile cases where speedy trial claims do not meet that third prong. *See United States v. Bilsky*, 664 F.2d 613 (6th Cir. 1981) (concluding that Speedy Trial Act rights are not irrevocably lost if an immediate appeal is unavailable).[6]

## 2.    Merits of Speedy Trial Claim

Finally, the broad reading of the "interest of justice" exception to the thirty-day requirement, 18 U.S.C. § 5036, stands decisively against the merits of A.R.'s speedy trial argument. Most on point are decisions by the Fourth and Second Circuits which considered and rejected defendants' claims that the thirty-day period required by 18 U.S.C. § 5036 had elapsed due in part to an intervening transfer motion. First, those courts concluded that the thirty-day clock begins to run on the date the juvenile is taken into federal custody.

---

[6]Our holding is limited to speedy trial claims filed after a district court has issued a transfer order. We do not address whether a juvenile delinquency speedy trial claim is reviewable before the substantive transfer order decision is rendered; an unpublished decision by this Court held that such a claim was not reviewable under the collateral order doctrine because that issue "is fully reviewable following an adjudication of delinquency." *United States v. Juvenile Male*, 178 F.3d 1297, 1999 WL 107594, at *2 (6th Cir. 1999) (unpublished decision) (per curiam).

## B. The Transfer Hearing

At A.R.'s transfer hearing, several witnesses testified on behalf of the Government and A.R. This testimony provided information relevant to the list of factors that the Federal Juvenile Delinquency Act ("FJDA"), 18 U.S.C. § 5032, requires judges to consider in determining whether to transfer a juvenile delinquent to adult criminal proceedings. Information was provided on the following enumerated factors:

## 1.    A.R.'s Age and Social Background

A.R. was 18 years old at the time of the transfer hearing, and was 17 and 18 years of age at the time of the alleged offenses. It is undisputed that A.R. has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and a learning disability. As the district court stated, there is little additional information on A.R.'s social background. The record indicates that he lives in a "low to middle class" income home. Although his parents never married, they have always been amicable, and, according to A.R., have both provided for his basic needs. Mr. Veldon Reedy, a clinical social worker who examined A.R., noted in his evaluation that A.R. has a stable home environment. Mary Jo Bell, the Intake Counselor for the Madison County Juvenile Court Services, testified that although A.R.'s mother was supportive, she was not in control of her son's behavior. Bell also testified that A.R. was at one time removed from the custody of his mother to be with his aunt, and spent considerable amounts of time with his aunt.

## 2.    The Extent and Nature of A.R.'s Prior Delinquency Record

Beginning in 1992, A.R. was charged with unruly conduct and placed in a Teacher, Parent, Probation Officer program and ordered to attend counseling at a behavioral center. His problems continued, however. In 1995, A.R. was charged with vehicular burglary, theft, and vandalism (under five hundred dollars). In the same year, he was arrested for

criminal trespassing, assault, and evading arrest. In March of 1996, A.R. was again charged with theft (of a Sears store) and disruption of a school assembly by fighting. In January 1997, A.R. was charged with disorderly conduct for fighting.

Despite these numerous arrests, A.R. has only been found guilty of two minor offenses. Some of the charges were dropped, and in other cases A.R. was ordered to stay away from the premises where the alleged incident occurred or to pay restitution to the victim. He has also been assigned to a number of specialty programs designed to address his disabilities.

### 3.  A.R.'s Intellectual Development and Psychological Maturity

Testing of A.R. has revealed low levels of academic achievement and intelligence. A.R. was initially tested and placed in special education classes when he was in middle school. He has long been diagnosed with ADHD and with a learning disability. The defense's expert, Mr. Reedy, testified that although A.R. is eighteen years old, those diagnoses generally cause a thirty percent "drop in expectations" for cognitive and emotional levels, meaning that a person of A.R.'s age and conditions functions at the level of a ten- to eleven-year-old. Ms. Estell Staten, the probation officer and community service caseworker for the Madison County Juvenile Court Services, testified that A.R. was able to communicate with her adequately and seemed of average intelligence.

### 4.  The Nature of Past Treatment Efforts and A.R.'s Response to Such Efforts

A.R. has been placed in special education classes since middle school. He has also undergone special investigation and behavioral treatment in a school program called the "M team," which designs individual educational and behavioral plans for youths with conditions such as A.R.'s. A.R.'s teacher, Ms. Arnold, testified that the M-team approach had achieved some success in A.R.'s treatment and educational

final decision, it is not reviewable unless it falls within the collateral order doctrine.[4] To fall within that doctrine,

> an order must (1) 'conclusively determine the disputed question,' (2) 'resolve an important issue completely separate from the merits of the action,' and (3) 'be effectively unreviewable on appeal from a final judgment.'

*Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)). Courts have uniformly concluded that orders transferring juveniles for adult prosecution are immediately appealable under the collateral order doctrine. *See, e.g.*, *One Juvenile Male*, 40 F.3d at 844 (concluding that a transfer order satisfies all three collateral order criteria).[5] Some courts have applied the logic of these decisions to appeals on procedural claims. *See, e.g.*, *Angelo D.*, 88 F.3d at 858 ("The justifications for allowing the immediate appeal of transfer orders remain the same regardless of whether the appeal is based on an alleged procedural or substantive deficiency.").

We believe that the logic of these holdings applies in this case. A speedy trial claim following a transfer order in the juvenile context implicates the very concern which allows us to hear appeals on the merits of transfer orders under the collateral order doctrine--namely, if defendants like A.R. have

---

[4]We can not hear this claim under pendent jurisdiction because it is not the case that "the appealable issue at hand cannot be resolved without addressing the nonappealable collateral issue." *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998).

[5]The crux of these decisions is the conclusion that the third prong of the collateral order test is met--that a transfer order is effectively unreviewable on appeal from a final judgment. Courts have found this prong to be satisfied by juvenile transfer orders because "an appeal from a final judgment would do little to resurrect the special protections afforded juvenile defendants" that will have been lost by the transfer--such as detention in foster homes rather than adult prisons and the sealing of records. *United States v. Angelo D.*, 88 F.3d 856, 858 (10th Cir. 1996).

th[e] program long enough to get long-term treatment, which is probably necessary." J.A. at 203-04. These determinations are well within the district court's fact-finding purview, are supported by evidence in the record, and are consistent with reasoning employed by past courts. *See T.F.F.*, 55 F.3d at 1121-22 (upholding a district court's conclusion that a defendant could not remain in the juvenile system after he reached nineteen). Although there is some testimony contradicting some of these conclusions, these are instances where the district court has simply chosen to credit the Government's evidence over A.R.'s. This is within its discretion, and is not clearly erroneous.[3]

### C.

A.R.'s second argument is that the Government violated 18 U.S.C. § 5036 because he was not brought to trial within thirty days of the date of his detention. Since he was detained on February 3, 1999, A.R. argues that he should have been brought to trial within thirty days of that detention--no later than March 5. Instead, even the transfer hearing was not conducted until March 30. A.R. filed a motion to set aside the transfer order on this ground, which the district court denied.

#### 1.   *Jurisdiction To Hear this Claim*

We find that this Court has jurisdiction to hear the speedy trial claim. Because the court's denial of the motion is not a

---

[3] Perhaps the most questionable aspect of the district court's reasoning is its assessment of the likelihood of rehabilitation at the privately-run Shelby Training Center--which Mr. Reedy testified would be better suited for A.R. Unlike the other state-run juvenile facilities (who do not treat persons over the age of 18), the Shelby Center treats people until they reach the age of 21. That would enable A.R. to receive about two years of treatment, casting some doubt on the district court's conclusion that the Shelby Center treatment would be "relatively short-term" for A.R. J.A. at 203. But given the court's broad discretion in making such a conclusion, and the fact that this is only one of the six factors to be weighed, this is not grounds for reversal.

progress. She stated that A.R. had the intelligence to be taught, demonstrated the ability to learn, and further "demonstrated that with the right structure he could function well with others." J.A. at 141. The defense claims that the attempts to treat A.R. and accommodate the ADHD and learning disability from which he suffers were not supported by the school system. Ms. Marcella Fletcher, a Tennessee Legal Services attorney who represented A.R. concerning special education issues, testified that she had to file a due process notice against the school in order to assure that A.R. would be treated properly for his ADHD.

Reedy testified that A.R. received Ritalin for about three years, but that the treatment had been discontinued. He further testified that with the medication, A.R. had "tended to do better"--without the medication, he was "going to be pretty much doomed to not being successful academically and [] behaviorally." J.A. at 170. Reedy further testified that the "M team" response was not adequate to treat A.R.'s problems--"I would like to have seen a more intensive type of work done . . . . [H]e should have had [] some intensive counseling since his early childhood." J.A. at 132.

#### 5.   *The Availability of Programs Designed to Treat A.R.'s Behavioral Problems*

Brenda Roden, the Madison County Juvenile Court Clerk, testified that the county's juvenile system had an age limit of 19. Christopher Bryant Worrell, an employee of the Correction Corporation of America at the Shelby Training Center in Memphis, Tennessee, testified as to the availability of that private facility for A.R. Worrell testified that the Center provides numerous programs offering education and guidance for incarcerated juveniles. Worrell explained that "there is further provided to an individual incarcerated over the age of eighteen educational opportunities based upon what needs and desires are necessary as determined by the guidance counselor. He (A.R.) would be placed into a structured environment . . . The facility is described as secured" and "rehabilitative in nature." J.A. at 221. Reedy testified that

the Shelby Center's "highly structured" environment, with both educational training and counseling components, would be helpful to A.R.  J.A. at 171-72.

On these facts, the district court ordered A.R. transferred to adult proceedings.

## II.

We review a district court's order of transfer for abuse of discretion.  *See United States v. T.F.F.*, 55 F.3d 1118, 1120 (6th Cir. 1995).  Such an abuse of discretion occurs "if the district court fails to make the required factual findings, or if those findings are clearly erroneous." *Id.*

## III.

## A.

The purpose of the Federal Juvenile Delinquency Act is to "remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *United States v. One Juvenile Male*, 40 F.3d 841, 844 (6th Cir. 1994) (citation omitted). This aim, however, is counter-balanced by the need to protect the public from violent and dangerous offenders and their criminal acts. *See id.*  Thus, a juvenile who commits a felony when he or she is fifteen or older may be subject to adult criminal procedures if a district court deems it to be "in the interests of justice." *T.F.F.*, 55 F.3d at 1119 (quoting 18 U.S.C. § 5032).  Specifically, a district court must "determine[] whether the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system [is] outweigh[ed by] the defendant's chance for rehabilitation." *One Juvenile Male*, 40 F.3d at 844. The statute requires that in making this determination, the district court must make record findings as to the following factors:

1)    the age and social background of the juvenile;

"juvenile record" is indeed unclear, but is a question we need not resolve in this case.[2]  Moreover, the fact that many of A.R.'s acts were merely property crimes, and did not involve actual violence, does not preclude the district court from considering them as part of this analysis.  Other courts have taken into account non-violent aspects of a delinquency record that show a "pattern of continuous lack of respect for authority . . . [and] that [a juvenile's] criminal activity is not an isolated event, but continued despite prior corrective and rehabilitative effort . . . ." *United States v. Juvenile No. 1*, 118 F.3d 298, 309 (5th Cir. 1997).

A.R.'s argument that the court did not give enough weight to A.R.'s low intellectual development and psychological maturity is also unavailing.  As stated *supra*, the district court can choose how much weight to give each factor, and courts have consistently rejected the notion that the failure to satisfy one or two factors negates the government's case for transfer. Moreover, courts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law. *See, e.g.*, *One Juvenile Male*, 40 F.3d at 845 (noting that a psychologist evaluating a defendant "did not believe an identified learning disability bore on defendant's ability to conform his conduct to law").

For similar reasons, the district court did not clearly err when it concluded that "past treatment efforts have failed," J.A. at 203, and that any juvenile treatment would be "short-lived" because A.R. is already over 18 and "couldn't stay in

---

[2]While the Eighth Circuit has concluded that § 5032's listing of a prior delinquency record as a factor only encompasses prior *convictions*, *see United States v. Juvenile LWO*, 160 F.3d 1179, 1182-83 (8th Cir. 1998), the Seventh Circuit has concluded that the phrase "record" includes both delinquency "convictions" and arrests, *United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998).  We need not resolve this question since the district court did not place greater weight on this factor relative to others. *See Anthony Y.*, 172 F.3d at 1253 (noting the different approaches but choosing not to decide which is appropriate because the additional conduct was also relevant to other statutory factors).

findings simply because the evidence is subject to multiple interpretations.")

In this case, the district court undertook an analysis of each factor. Its conclusions regarding each factor are reasonable interpretations of the facts, and comport with caselaw from this and other circuits.

First, the court's noting A.R.'s advanced age was consistent with this Court's and other courts' conclusions that the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult. *See, e.g.*, *T.F.F.*, 55 F.3d at 1121 (accepting district court's reasoning that "because defendant was eighteen at the time of the transfer hearing, there was little time to rehabilitate defendant within the juvenile system"); *United States v. Smith*, 178 F.3d 22, 27 (1st Cir. 1999) ("[T]he proximity of a juvenile's age to age eighteen is another important factor for the court's consideration."); *United States v. Juvenile No. 1*, 118 F.3d 298, 308 (5th Cir. 1997) (affirming district court's conclusion that a defendant was "rapidly approaching the age at which he should be held accountable for his actions under the adult criminal justice system").

Similarly, the court's placing considerable weight on the nature of A.R.'s crimes is both reasonable and consistent with precedent. As this Court noted in *One Juvenile Male*, "[t]he practice of giving great weight to the nature of the alleged offense in determining a juvenile's prospect for rehabilitation has been sanctioned by several courts." 40 F.3d at 846. The court's emphasis on the seriousness of armed robbery in particular has also been echoed by other courts. *See, e.g.*, *Smith*, 178 F.3d at 26 (noting that in every published case where a juvenile was transferred to adult status for armed robbery, the transfer was upheld by the appellate court).

A.R. challenges the district court's conclusion that he has an "extensive prior delinquency record" by claiming that as most of that record involves charges that were dropped, he has actually only been found guilty of several minor delinquent acts. The scope of § 5032's reference to the

2) the nature of the alleged offense (which, for the purposes of this inquiry, a court may assume to have been committed, *see One Juvenile Male*, 40 F.3d at 845), including the defendant's role in the offense;

3) the extent and nature of the juvenile's prior delinquency record;

4) the juvenile's present intellectual development and psychological maturity;

5) the nature of past treatment efforts and the juvenile's response to such efforts; and

6) the availability of programs within the juvenile system designed to treat the juvenile's behavioral problems.

*See* 18 U.S.C. § 5032. It is up to the district court "how much weight to give each factor." *T.F.F.*, 55 F.3d at 1120.

Title 18 U.S.C. § 5036, which A.R. claims has also been violated, provides a "speedy trial" component to delinquency adjudications:

If an alleged delinquent who is in detention pending trial is not brought to trial within thirty days from the date upon which such detention was begun, the information shall be dismissed on motion of the alleged delinquent or at the direction of the court, unless the Attorney General shows that additional delay . . . would be in the interest of justice in the particular case.

18 U.S.C. § 5036.

### B.

### 1.

The district court looked at the evidence regarding each of the six enumerated factors, making the following determinations. First, the district court noted that A.R. was 18, "so he is now an adult by legal standards." The court also noted that it had "very little information about his social background." J.A. at 201. Second, the court found the nature of the alleged offenses to be "serious"-- "among the most serious crimes that can be alleged." J.A. at 201-02. The court further noted that one of the alleged drug offenses occurred when A.R. had already reached 18. Third, the court found that A.R. had an "extensive prior delinquency record ranging from disorderly behavior, or disruptive behavior, all the way through robbery." J.A. at 202. Fourth, the court found that A.R.'s intellectual development and psychological maturity were "low." "He seems at best low average on the academic achievement and intelligence testing." J.A. at 202. The court noted that this was a factor that "would militate toward keeping him as a juvenile." *Id.* [1] Fifth, the court found that regardless of whose fault it was,[1] past treatment efforts had failed to remedy A.R.'s behavioral problems. Despite "numerous individualized educational plans tried, none of [them] have worked. Alternative schools were tried but had not worked. In fact, the more the system tried to concentrate on the juvenile's problems, the more serious his crimes became." J.A. at 203. Finally, crediting Mr. Worrell's testimony, the court found that there are programs available within the juvenile system for behavioral problems such as A.R.'s. However:

the problem[] with those programs is that for this juvenile they would be relatively short-term. He's already over 18. He wouldn't stay in that program or

---

[1] A.R. and some of his witnesses claimed that the school's treatment had been inadequate.

couldn't stay in that program long enough to get long-term treatment, which is probably necessary.

J.A. at 203-04. In sum, after having "consider[ed] all the factors as a whole," the district court concluded that it had "no choice but to rule that [A.R.] should be transferred for adult prosecution." The court placed particular weight on the juvenile system's inadequacy in "handl[ing] juveniles of this background and of this sort." J.A. at 204.

### 2.

We do not find that the district court abused its discretion in issuing the transfer order. The burden which A.R. must overcome is high indeed. Even though "the government bears the burden of rebutting the statutory presumption of juvenile treatment," the "statute does not require more" from a district court than simply to make findings for each factor, and to consider each factor in determining whether the transfer would be in the interests of justice. *T.F.F.*, 55 F.3d at 1121. Moreover, a district court has broad discretion in how it balances and weighs the import of the different factors--"[t]he court need not even find a majority of factors weigh in favor of the prevailing party, as it is not required to give equal weight to each factor but may balance them as it deems appropriate." *United States v. Anthony Y.*, 172 F.3d 1249, 1252 (10th Cir. 1999)(quoting *United States v. Leon, D.M.*, 132 F.3d 583, 589 (10th Cir. 1997)) (internal quotation marks omitted). It also has broad discretion in how the adduced facts color its consideration of each factor, particularly since "many of the statutory factors leave considerable room for interpretation . . . and neither § 5032 nor the case law interpreting it specifies how these characteristics should be assessed in a particular juvenile." *Leon, D.M.*, 132 F.3d at 590-91. In sum, the trial court's decision carries great weight at the appellate level. *See Anthony Y.*, 172 F.3d at 1254 ("Under our deferential standard of review[], we do not evaluate whether we would have made a different finding in the first instance, nor do we reverse adequately supported