RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                                        *Plaintiff-Appellee,*

        *v.*

J.A.S., JR., a juvenile male,

                                          *Defendant-Appellant.*

> No. 15-2480

_____

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:15-cr-00018-1—R. Allan Edgar, District Judge.

Argued: February 2, 2017

Decided and Filed: June 12, 2017

Before: GIBBONS, COOK, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** C. Mark Pickrell, VANDERBILT APPELLATE LITIGATION CLINIC, Nashville, Tennessee, for Appellant. Jeff J. Davis, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Alistair E. Newbern, VANDERBILT APPELLATE LITIGATION CLINIC, Nashville, Tennessee, for Appellant. Jeff J. Davis, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

KETHLEDGE, Circuit Judge. In February of 2014, the eight year-old victim in this case, whom we refer to as KV, accused her seventeen year-old uncle, whom we refer to as JAS, of sexually abusing her on tribal land. Specifically, she said that JAS had vaginally raped her,

though she did not use that term. The FBI soon interviewed KV, who described the assault to an interviewer who had conducted more than 5,000 such interviews. JAS was thereafter charged with an act of juvenile delinquency, to wit, sexual abuse of a child under the age of twelve in violation of 18 U.S.C. § 2241(c). The district court held a bench trial under 18 U.S.C. § 5032 and found beyond a reasonable doubt that JAS had sexually assaulted KV as charged. Although the Sentencing Guidelines would have recommended a life sentence had JAS been an adult, his maximum sentence as a juvenile was only five years of "official detention," *see* 18 U.S.C. § 5037(c)(2)(A), and the district court sentenced him to three. JAS now appeals, arguing that the district court improperly admitted the video of the victim's FBI interview and that the evidence at trial was insufficient to support the finding that he sexually assaulted KV. We affirm.

In February 2014, KV lived with JAS, JAS's father, and her paternal grandmother in a home on tribal land in Michigan's Upper Peninsula. On February 20, KV went out to lunch with her mother, Shannon Lehre, and KV's maternal grandmother, Kathy Noel. Lehre and Noel discussed a local man named Dale Betlam, who had recently been convicted of sexually abusing his daughter Jessica—one of KV's closest friends. Lehre told KV that she should speak up if anybody ever hurt her like that. KV responded that JAS had "done that to [her]." That evening, Lehre questioned KV about what, exactly, JAS had done. KV said that she and JAS had been home alone together on February 18 and that JAS had "put his pee in [her]."

Lehre contacted the tribal police the next morning. About a week later, two nurses examined KV for evidence of sexual assault. KV told the nurses that JAS had "put his thing in [her] thing," which had "hurt." The nurses' examination revealed no evidence of vaginal injury.

The tribal police promptly referred KV's case to the FBI. Catherine Connell—an FBI child-forensic interviewer with 28 years' experience—interviewed KV about the alleged assault. KV said that she and JAS were home alone on February 18, that she had gone into JAS's room to play videogames with him, and that minutes later JAS had pulled down both his pants and hers, covered her eyes with his hand, and put "his thing in [hers]." She also said that, when JAS was done, he had threatened to kill her if she told anyone about the incident. KV further said that she had run from JAS's room and locked herself in her bedroom until an adult got home. Finally, KV said that, hours after the assault, she had urinated and felt a burning pain.

KV testified at JAS's bench trial, again describing the February 18 incident essentially as she described it to Connell. On cross-examination, JAS's attorney tried to impeach KV by pointing out that some aspects of her trial testimony were new (*e.g.*, that JAS had put his hand on her thigh before the assault) and by highlighting some collateral points on which her testimony and her prior descriptions supposedly differed. The government then moved to admit the video of Connell's interview with KV. The defense objected on hearsay grounds, but the court eventually admitted the video as substantive evidence.

JAS now argues in his brief that the video of KV's interview with Connell was inadmissible hearsay. We review the district court's evidentiary ruling for an abuse of discretion. *United States v. Carpenter*, 819 F.3d 880, 891 (6th Cir. 2016).

The district court admitted the video under Federal Rule of Evidence 807, which sets forth the so-called residual exception to the hearsay rule. JAS contends that the video did not meet the rule's requirements for admissibility. But whether it did is beside the point because—as JAS's counsel, to his credit, largely conceded at oral argument—the video was plainly admissible under another rule, namely Rule 801(d)(1)(B)(ii). That rule allows for the admission of prior out-of-court statements of a trial witness (here, KV) if three requirements are met: first, the statements are consistent with the witness's testimony; second, the statements are offered to rehabilitate the witness after an opposing party has tried to impeach her "on another ground"; and third, the opposing party is able to cross-examine the witness about the prior statements. All three requirements were met as to the video here: KV's description of the rape during her interview with Connell was largely consistent with her description of it during her testimony at trial; the government moved to admit the video after JAS sought to impeach KV on collateral grounds; and JAS's counsel not only had the ability to cross-examine KV about the video but in fact did so. Hence the district court properly admitted the video.

JAS also challenges the sufficiency of the evidence supporting the district court's finding that he sexually assaulted KV in violation of 18 U.S.C. § 2241(c). We must reject that challenge if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Here, the criminal information specified that the unlawful sexual act was "contact between the penis and the vulva," which for purposes of § 2241 means "penetration, however slight." 18 U.S.C. § 2246(2)(A).

To prove penetration, the government introduced KV's testimony and her out-of-court statements about the assault. Specifically, KV testified that JAS pulled down both his and her pants, and then "put his pee in [her] pee." In addition, when the prosecutor asked KV where her "pee" was, she pointed to her groin and confirmed that she was referring to the "private area . . . between [her] legs." KV also explained that, although JAS had covered her eyes during the assault, she knew that his "pee" was in her vagina because she "felt it," and it "hurt bad." Finally, KV said that, hours after the assault, she urinated and her "pee" burned "like it was on fire."

KV's out-of-court statements were to the same effect. In her interview with Connell, she said that JAS "put his thing in [hers]." She then clarified that she was referring to her "pee," which "burned" and "hurt a lot" when JAS penetrated her, and then burned again when she urinated after the assault. KV also told one of the nurses who examined her that JAS "put his thing in [her] thing," which hurt. Taken together, KV's testimony and out-of-court statements provided ample proof that JAS's penis penetrated her vagina.

JAS points to four cases from other circuits that he says support the opposite conclusion. As an initial matter, none of those cases bind us here. And in all four cases the government's evidence of penetration was not as specific as it is here. In *United States v. White Bull*—where the defendant was charged with "intentional touching, not through the clothing, of [a child's] genitalia," *see* 18 U.S.C. § 2246(2)(D)—the victim testified that she could not remember where the assailant had touched her. 646 F.3d 1082, 1090 (8th Cir. 2011). Similarly, in *United States v. Reddest*—where the defendant was charged with penetration of the "genital opening . . . by a hand or finger," *see* 18 U.S.C. § 2246(2)(C)—the victim testified that the assailant had "just touched the outside of [her] vagina." 512 F.3d 1067, 1072 (8th Cir. 2008). And in *United States v. Plenty Arrows*—where the defendant was charged with "contact between the penis . . . and the anus," *see* 18 U.S.C. § 2246(2)(A)—the victim testified more generally that his stepfather's penis

had touched the "back of [his] behind." 946 F.2d 62, 65 (8th Cir. 1991). Here, KV said that JAS's "pee" had been "*in* [her] pee" or "*in* [her] thing"—not just that his "pee" had touched her.

The remaining case we probably disagree with, though it too is easy enough to distinguish. In *United States v. IMM*, the defendant again was charged with "contact between the penis . . . and the anus." 747 F.3d 754, 757 (9th Cir. 2014) (quoting 18 U.S.C. § 2246(2)(A)). There, a child witness testified that he saw the defendant put his penis "in" another child's "private [that] poops." *Id.* at 772. That testimony, the Ninth Circuit held, was insufficient to support the conviction because the testimony did "not offer a basis for distinguishing between 'in the cheeks' and [actual] penetration." *Id.* But unlike the witness there—who could testify only about what he saw—KV testified here that she "felt" JAS's penis inside her, which "hurt bad[ly]." She also said that her "pee" burned when she urinated after the assault—which is evidence that JAS's penis actually entered her vagina.

Finally, JAS argues that medical evidence proves that his penis never entered KV's vagina. But JAS did not make that argument in his appellate brief, in which he described the medical evidence as "inconclusive." Appellant's Br. at 38. That is reason enough to reject the argument. *See Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 751 n.3 (6th Cir. 2015). The argument also fails on the merits. True, when the nurses examined KV, they found no evidence of vaginal injury. And JAS's expert, Dr. Stephen Guertin, testified that a girl of KV's age "wouldn't tolerate full penile vaginal intercourse without [sustaining] significant injury"— specifically, a "deep notch" or "complete transection" in her hymen. But Guertin conceded that intercourse does not always cause injury to a child's hymen. Moreover, Guertin said, injuries to the hymen heal quickly—so quickly that an injury that was readily apparent during "the first few days" after a child was abused might be hard to detect "beyond the seven-to-ten day range." Here, the nurses examined KV more than a week after the charged incident. And Guertin testified that if a child suffers something short of "full penile vaginal intercourse"—for example, "penetration, however slight," *see* 18 U.S.C. § 2246(2)(A)—then the "possibility of finding [an injury] is dramatically less."

Thus, as Guertin conceded on cross-examination, the "physical examination in this case doesn't tell [us] . . . anything." A rational jury could therefore choose to believe KV's testimony notwithstanding the results of the examination.

The district court's judgment is affirmed.