NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0492n.06

No. 24-1216

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | December 4, 2024 |
| | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| C.J.M., | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| Defendant-Appellant. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| | ) | **UNSEALED OPINION**[*] |

Before: BATCHELDER, MOORE, and BUSH, Circuit Judges.

**BUSH, Circuit Judge.** C.J.M. is an American Indian male who was a juvenile at the time of the events underlying this case. He appeals the district court's order granting the motion of the United States to transfer him to adult criminal court. The only question before us is whether the district court abused its discretion in determining that C.J.M.'s transfer is "in the interest of justice" under the Federal Juvenile Delinquency Act (FJDA). *See* 18 U.S.C. § 5032. The answer to that question is no. We therefore **AFFIRM**.

**I.**

On March 16, 2023, C.J.M. and an accomplice executed a premeditated attack on a detention officer and escaped the Sault Tribe Youth Facility (STYF). Surveillance footage shows the two minors beating the officer with a metal toilet rail until the officer surrendered his keys.

---

[*]On December 4, 2024, the court filed this opinion under seal, and granted counsel ten (10) days to move for redaction of sensitive information, if any, contained in the opinion. On December 26, 2024, the court, having received no motion for redactions, unsealed the opinion. The date the opinion is deemed to have been filed remains December 4, 2024.

The minors then locked the officer in a cell and fled. Several days later, C.J.M. and his accomplice were apprehended in Sault Ste. Marie, Michigan and returned to STYF.

The government filed a sealed Juvenile Information in May 2023, alleging that C.J.M. committed kidnapping in violation of 18 U.S.C. § 1201(a)(2); assault with a dangerous weapon in violation of § 113(a)(3); and escape from a juvenile facility in violation of Mich. Comp. Laws § 750.186a(1). The government simultaneously filed a motion to transfer C.J.M. to an adult criminal court under 18 U.S.C. § 5032.

On December 13, 2023, the district court held a sealed, day-long hearing on the motion to transfer. The government called five witnesses. C.J.M. called none. Federal Bureau of Investigation (FBI) Special Agent Grout testified that C.J.M. had explained how the escape was an attempt to avoid criminal charges against him in state court. Grout also testified to C.J.M.'s meticulous planning of the escape, and the agent presented and narrated to the court the surveillance video footage of the attack. According to Grout, C.J.M. broke off a handicap grabrail from the shower room and used the end with protruding screws to beat the officer into submission. The officer suffered numerous injuries as a result. Grout's report of his pre-hearing interview with C.J.M. contained further troubling admissions. For example, when Grout asked C.J.M. whether he "would be willing to kill someone to escape," C.J.M. answered "to be honest, yeah," R. 57, Ex. 97, PageID.593–94, and even doubled down on that assertion. *Id.* ("When asked if he was sure about that, [C.J.M.] again answered yes.")

The district court also heard remote live testimony from Bianca Shoulders, a juvenile administrator at the Bureau of Prisons (BOP); Noella Heller, the case manager and a substance abuse counselor at the Shawno Center, where C.J.M. stayed for a prior juvenile offense; Alison Cox, the director of the Porter County Juvenile Detention Center, which expelled C.J.M. for a

separate aggressive incident when he was being held on the present charges; and Melinda McNeil, the program supervisor at Great Lakes Area Teaching Family Homes (TFH), a youth services center in Newberry, Michigan where C.J.M. also stayed for a very brief period of time. The district court additionally ordered and reviewed deposition testimony of Dr. Kari Scovel, who evaluated C.J.M. in June 2023.

Each of the live witnesses testified to her experiences and encounters with C.J.M. Ms. Shoulders addressed how the juvenile facilities' available programs compare to the adult BOP system's programs, including psychiatric care, psychological services, literacy programs, and substance abuse treatment. Ms. Heller testified about C.J.M.'s stay at Shawno Center, specifically his completion of its nine-step program over the course of his year-long stay. Ms. Cox testified to C.J.M.'s stay at the Porter County juvenile facility, the treatment he received, his behavioral issues, and an incident in early September 2023, when C.J.M. had to be confined to his room after being overheard asking whether a plan of attack was still on. Ms. Cox described how on September 16, 2023, C.J.M. became violent in his room, ripping a security camera off the wall and brandishing it like a weapon. She explained that C.J.M. became a "heightened security risk" and had to be tased in a last-ditch effort to de-escalate the situation. As a result, C.J.M. was removed from the Porter facility a few days later. Finally, Ms. McNeil testified to C.J.M.'s recalcitrance in seeking treatment during his time at TFH, describing how he would snort ibuprofen, make weapons, and destroy property in efforts to get out of treatment. She also discussed C.J.M.'s fleeing of the facility on two separate occasions.

After the hearing, the district court issued an order granting the government's motion to transfer. The court concluded first that the defendant's age weighs in favor of transfer, but his social background weighs heavily against transfer. Next, the court found transfer to be supported

by the nature of the offense, the extent and nature of C.J.M.'s violent history and criminal record, and his present intellectual development and psychological maturity. Lastly, the court concluded that while the nature of past treatment efforts and C.J.M.'s response weighed only somewhat in favor of transfer, C.J.M. had "maxed out" his rehabilitative potential in the juvenile system, a fact that strongly favors transfer. On that basis, the district court ordered C.J.M. transferred to adult criminal court because it was "in the interest of justice" under 18 U.S.C § 5032.

## II.

We review the district court's order for abuse of discretion. *United States v. A.R.*, 203 F.3d 955, 959 (6th Cir. 2020). An abuse of discretion occurs when the district court "fails to make the required factual findings, or if those findings are clearly erroneous." *United States v. T.F.F.*, 55 F.3d 1118, 1120 (6th Cir. 1995).

Our review involves the FJDA, which seeks to "remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation." *United States v. One Juv. Male*, 40 F.3d 841, 844 (6th Cir. 1994) (citation omitted). But that objective is weighed against the need to protect the public from the criminal acts of violent and dangerous offenders. *A.R.*, 203 F.3d at 959. That is, the district court must determine whether "the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system is outweighed by the defendant's chance for rehabilitation." *Id.* (cleaned up).

In answering that question, § 5032 requires the court to make record findings for each of the following factors:

1) the age and social background of the juvenile;
2) the nature of the alleged offense;
3) the extent and nature of the juvenile's prior delinquency record;
4) the juvenile's present intellectual development and psychological maturity;

> 5) the nature of past treatment efforts and the juvenile's response to such efforts; and
>
> 6) the availability of programs within the juvenile system designed to treat the juvenile's behavioral problems.

*See id.* at 960. The court also has wide discretion in determining "how much weight to give each factor." *T.F.F.*, 55 F.3d at 1120 (citing *One Juv. Male*, 40 F.3d at 845–46).

The district court did not abuse its discretion in issuing the transfer order. Its decision "carries great weight at the appellate level." *A.R.*, 203 F.3d at 961. And as C.J.M. concedes, the court undertook a careful analysis of each statutory factor. It considered all the evidence in the record, thoroughly explaining why the different factors deserve greater or lesser weight.

"[T]he closer a [juvenile] is to eighteen, the greater the presumption that he be treated as an adult." *A.R.*, 203 F.3d at 961. C.J.M. was 17 years old when he escaped STYF, less than one year before his eighteenth birthday. While that factor supports transfer, the most compelling factor militating against transfer is C.J.M.'s social background. As the district court stated, C.J.M. had a "heartbreakingly traumatic childhood." R. 68, Op. & Order, PageID.1110. The district court noted that C.J.M.'s childhood was plagued with parental substance abuse and mental illness, personal substance abuse, physical abuse, sexual abuse, neglect, domestic violence, and overall instability. The court observed that "trauma-impacted youth" need "highly-structured programming tailored to their specific psychological and psychiatric needs" to "have any chance at rehabilitation." *Id.* And, as the court also recognized, structured programming is better found in juvenile centers than in adult prisons.

However, the court also placed significant weight on the nature of the alleged offense, C.J.M.'s prior juvenile record, and his response to past treatment efforts, concluding that these factors strongly counsel in favor of transfer and outweigh C.J.M.'s difficult upbringing. For purposes of a transfer motion, the district court may "assume the juvenile committed the alleged

offenses." *One Juv. Male*, 40 F.3d at 845. The surveillance video shows C.J.M. and his accomplice jumping out from behind closed doors; trapping the officer in a corner; brutally beating him 19 times with the screws-end of a grabrail until he surrendered his keys; locking him in a shower room; and fleeing the facility. The attack left the detention officer with serious injuries. But worse still, the evidence presented to the district court revealed C.J.M. was "callous[ly] indifferen[t]" to the officer's life. *See* R. 68, Op. & Order, PageID.1111. C.J.M. admitted to devising the escape plan on his own over the course of several weeks. The district court also could not ignore the contradiction of C.J.M.'s advocating to remain in the same juvenile detention system that he had actively escaped numerous times over. In fact, C.J.M. had told Special Agent Grout that he would not hesitate to try to escape from the youth facility again.

The March 2023 incident was not the first time C.J.M. had engaged in violent behavior while in detention or on probation. Indeed, C.J.M.'s criminal history is profound, including multiple delinquencies and probation violations in both state and Sault Tribe court systems. His record includes incidents of, and juvenile delinquency proceedings tied to, vandalism, theft, and robbery, just to name a few.

C.J.M.'s treatment history offers no point in his favor either. Over the course of the last four years, C.J.M. attended three different court-ordered, inpatient substance abuse and mental health treatment programs. He completed only one program fully. However, after completion of that program, he reverted to his old ways, resorting to more substance abuse and criminal acts. The other two rehabilitation attempts resulted in his running away. Thus, the district court committed no clear error in finding that C.J.M.'s prior treatment efforts also counseled for his transfer to adult criminal court.

Similarly, the district court did not clearly err when it concluded that C.J.M. "has the cognitive ability to conform his conduct to the law." *A.R.*, 203 F.3d at 962. The court detailed how he can articulate the difference between right and wrong and noted his "average overall intelligence level," evinced by his ability to methodically plan and carry out the March 2023 attack and escape. R. 68, Op. & Order, PageID.1115.

For the last factor, the district court analyzed the difference in programs available in the adult BOP system versus the juvenile system, noting that the individualized treatment plans offered to youth offenders would be more valuable to C.J.M. However, given the escalation of C.J.M.'s violent behavior over time, the court acted within its discretion to conclude that C.J.M.'s prospects for rehabilitation in the juvenile system had run their course.

On appeal, C.J.M. argues that although his acts are "deplorable," they do not rise to the level of "gang-related cold-blooded murders or carjackings" involved in other cases. Appellant Br. at 23 (citing *United States v. Female,* 581 F.Supp.3d 482 (E.D.N.Y. 2022) (racketeering, racketeering conspiracy, murder in aid of racketeering, among other things); *United States v. Male*, 610 F.Supp.3d 474 (E.D.N.Y. 2022) (murder, murder in aid of racketeering, and conspiracy to distribute cocaine and marijuana); *T.F.F.*, 55 F.3d 1118 (carjacking and use of a firearm during a crime of violence); *United States v. Mendez*, 28 F.4th 1320 (9th Cir. 2022) (conspiracy, first-degree murder, violent crimes in aid of racketeering, and aiding and abetting)). True, "the practice of giving great weight" to the seriousness of an "alleged offense in determining a juvenile's prospect for rehabilitation has been sanctioned by several courts," including this court. *See One Juv. Male,* 40 F.3d at 846. And true, C.J.M.'s actions did not take a person's life. However, the district court did not abuse its discretion in striking the balance between this factor and the other five § 5032 factors. C.J.M. still showed grave indifference to the detention officer's life. The district court

committed no clear error concluding that C.J.M.'s record, taken as a whole, reveals an "escalating pattern of destruction," and that his "increasingly destructive and violent behavior" favors transfer. R. 68, Op. & Order, PageID.1115.

C.J.M. further argues that the court should have given more weight to his traumatic background and his short-lived, successful response to one treatment program and should have placed less emphasis on his juvenile history. He also believes *United States v. J.A.S., Jr.* is a comparable case, arguing that the defendant there was not transferred to adult criminal court, despite committing the arguably more heinous crime of sexually abusing his eight-year-old niece. 862 F.3d 543, 544 (6th Cir. 2017).

Those final arguments fail for two reasons. First, *J.A.S., Jr.*, did not involve a motion to transfer the juvenile defendant to adult criminal court. Rather, the panel affirmed the defendant's underlying conviction and addressed the defendant's evidentiary and sufficiency challenges. *Id.* at 545–47. Second, as explained previously, the district court "may balance [the factors] as it deems appropriate" and "is not required to give equal weight" to each one. *A.R.*, 203 F.3d at 961 (citation omitted). Its primary duty is to "make findings for each factor, and to consider each factor in determining whether the transfer would be in the interests of justice." *Id.* The district court did so here. It explained in great detail why it concluded that the standard for transfer was met. The court explicitly acknowledged the grueling trauma C.J.M., while not yet 18 years old, had experienced, but reasonably concluded that, in context with the other § 5032 factors, the transfer of C.J.M. to adult criminal court was indeed "in the interest of justice."

### III.

For the reasons set forth above, we **AFFIRM**.